639 F.2d 1296
 36 Fair Empl.Prac.Cas. 1601,
25 Empl. Prac. Dec. P 31,663
Charlie CORLEY and Levaughn Carter, individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants,
v.
JACKSON POLICE DEPARTMENT, Etc. et al., Defendants-Appellees.
Charlie CORLEY and Levaughn Carter, Plaintiffs-Appellants,
v.
Russell C. DAVIS, Mayor and Commissioner of the City of
Jackson et al., Defendants-Appellees.
 No. 79-3205.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 March 19, 1981.
 Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., for plaintiffs-appellants.
 Howard Ross, E. Grady Jolly, Michael Farrell, Jackson, Miss., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Mississippi.
 Before WISDOM, COLEMAN and RANDALL, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 This is the second time this litigation has come before us. The plaintiffs allege that they were discharged in retaliation for opposing racially discriminatory employment practices, in violation of section 704(a) of the Civil Rights Act of 1964, 28 U.S.C. § 2000e-3(a) (1976).[1] We reversed an earlier judgment for the defendants because the district court applied an incorrect legal standard. Corley v. Jackson Police Dept., 5 Cir. 1978, 566 F.2d 994. On retrial, the district court held that the plaintiffs had made out a prima facie case of retaliatory firing. It found, however, that the plaintiffs were actually fired because they had accepted bribes from known bootleggers and that the plaintiffs did not show this reason to be a pretext for their dismissal. Because we do not find these conclusions to be clearly erroneous or legally incorrect, we affirm.
 
 
 2
 The plaintiffs, Charlie Corley and Levaughn Carter, were among the first blacks hired as police officers in the Jackson Police Department. The defendants concede that the Department remained internally segregated from the time of their hiring in 1963 until Lavell Tullos became Chief of Police in 1970. Tullos took direct steps to eliminate segregation, but there is dispute over how quickly and how effectively his directives were carried out.
 
 
 3
 In May 1972 twenty-nine officers filed a suit challenging a new system of promotion, rank structure, and pay scales instituted under Tullos. Taylor v. City of Jackson, S.D.Miss., Civil No. 72J-87(C). Three of the plaintiffs were black Carter, Corley, and one other officer who later withdrew. Among the numerous counts of the Taylor complaint were several alleging continued racial segregation within the Department. Not all officers agreed with the aims of the Taylor suit; 160 officers, including nine blacks, intervened as defendants in the case. Corley and Carter also filed individual charges with the Equal Employment Opportunity Commission (EEOC), alleging discrimination in promotions and job assignments.
 
 
 4
 On October 31, 1972, Lieutenant Willie Orr of the Department's Internal Affairs Division received a tip from an informer that Corley and Carter were receiving payoffs from a bootlegger. At the same time, unknown to Orr, the U.S. Treasury's Bureau of Alcohol, Tobacco, and Firearms (ATF) was investigating the bootleg liquor traffic in Jackson. On November 3, ATF agents arrested 24 suspected bootleggers. One of them, James Johnson, told ATF agent Krohn that he was paying off Corley and Carter. Krohn immediately summoned Orr. Johnson repeated his statement about Corley and Carter and, under pressure from Orr, mentioned six other officers to whom he had made payoffs in cash or liquor four identified black officers, one identified white officer, and one unidentified white officer. Orr launched an informal investigation into these allegations, but he could find no other bootleggers who would admit to paying off any officers. Finally, Orr asked Johnson and his common-law wife, Johnnie Strahan, to notify him if any officer requested a payoff. At about the same time, on November 17, Corley and Carter were transferred to an evening walking beat near Johnson's house.
 
 
 5
 What happened next is hotly disputed. According to the Department's account (accepted by the district court), Corley and Carter stopped by Johnson's house three times on November 26 for a payoff. On the third time they demanded and received a five-dollar payoff, split between them. Johnson notified Orr. After consulting his superiors, Orr gave Johnson and Strahan ten marked one-dollar bills and a radio transmitter. On December 2 (a Saturday evening), Corley and Carter again went to Johnson's house. This time, allegedly, they took the marked money as a payoff. Corley and Carter, for their part, deny ever having gone to Johnson's house. They allege that either Johnson or Orr framed them by sending an unidentified man, whom they met on a street-corner; he asked for a ten dollar bill in exchange for ten ones. Neither Corley nor Carter had a ten but, so they testified, each exchanged a five dollar bill for five ones. The one dollar bills were marked by a fluorescent orange powder.
 
 
 6
 Corely and Carter were picked up a few minutes after the alleged payoff and taken to headquarters. Each was carrying five of the marked bills. Corley admitted to the police, "I know you've got me. You've got the goods on me, you've got the money. But I didn't get it where you think I did." (Orr, Tr. 658). Corley then acknowledged that he would be suspended and asked Lieutenant Orr and Captain Bennett to talk to the Chief for him to get a light suspension. They were both suspended from duty immediately. The following Monday morning, Chief Tullos discharged the two officers.
 
 
 7
 After their discharge, Corley and Carter voluntarily withdrew from the Taylor suit, instead presenting their racial allegations in an independent class action. The remaining Taylor plaintiffs, all white, abandoned all allegations of racial discrimination, and the suit was eventually dismissed for lack of federal subject matter jurisdiction. Taylor v. City of Jackson, 5 Cir. 1973, 487 F.2d 213 (per curiam). All racial class allegations were settled in a consent decree entered in Corley's and Carter's suit and two parallel suits. In the meantime, after pursuing EEOC charges, Corley and Carter filed the present suit alleging retaliatory discharge.
 
 
 8
 We held in the previous appeal in this case that the order and burden of proof in a section 704(a) complaint are the same as in an individual complaint under section 703:
 
 
 9
 (1) (T)he plaintiff must present a prima facie case of racial discrimination; (2) the employer then has the burden of proving, by a preponderance of the evidence, that legitimate, nondiscriminatory reasons existed to support his action; and (3) the plaintiff then has the burden of proving by a preponderance that the employer's articulated reason was a pretext for discrimination.
 
 
 10
 566 F.2d at 998-99, quoting Turner v. Texas Instruments, Inc., 5 Cir. 1977, 555 F.2d 1251, 1256. See McDonnell Douglas Corp. v. Green, 1973, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; Furnco Construction Co. v. Waters, 1978, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957; East v. Romine, Inc., 5 Cir. 1975, 518 F.2d 332.[2]
 
 
 11
 After remand, the district court properly concluded on the basis of our previous opinion that Corley and Carter had made out a prima facie case of retaliatory discharge. The burden of going forward shifted then to the Department to rebut the plaintiffs by showing a legitimate, nondiscriminatory reason for firing them. The court found that the Department had shown such a reason. Finally, the court decided that the plaintiffs had not carried the burden of showing that the defendants' explanation was pretextual. The trial judge demonstrated a complete understanding of the standards established in McDonnell Douglas, Turner, and Romine.
 
 
 12
 Corley and Carter contend that the district court applied the wrong legal standard in finding a legitimate reason for their discharge. It is not enough, they argue, to find that the Department or its higher officers had "reason to believe" that Corley and Carter accepted bribes on December 2; rather, the Department must show that they did in fact accept bribes. This is squarely contrary to our holdings in this and other cases that a mistaken but good-faith belief that an employee has violated the employer's rules is sufficient to rebut the McDonnell Douglas inference that the employee was discharged for impermissible reasons. Corley, 566 F.2d at 1003 n.14; Turner, 555 F.2d at 1256-57; Jeffries v. Harris County Community Action Ass'n, 5 Cir. 1980, 615 F.2d 1025, 1036. In any case, it is plain from the record that the district court did in fact consider and reject the plaintiffs' assertion of innocence. That finding is not clearly erroneous. The issue was largely a credibility battle between those witnesses who testified to the payoff at Johnson's house and those witnesses who testified to the innocent street-corner exchange. The magistrate's lengthy and lucid opinion, adopted by the district court, explains in commendable detail why the court chose to credit the police witnesses and discredit the plaintiffs' witnesses. Of course, a trial court's credibility decisions will rarely be disturbed on appeal especially when, as here, the reasons for those choices are articulated in terms of the facts in evidence. See, e. g., Busby v. Daws, 5 Cir. 1979, 592 F.2d 1241; Chaney v. City of Galveston, 5 Cir. 1966, 368 F.2d 774.
 
 
 13
 The plaintiffs' more substantial contention is that even though they were guilty of accepting the bribes, their discharge nevertheless violates section 704(a) because they were singled out for investigation and discharge owing to their opposition to racial discrimination. In McDonnell Douglas and in McDonald v. Santa Fe Trail Transportation Co., 1976, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493, the Supreme Court held that, although a criminal act can justify the discharge of or refusal to hire its perpetrator, such act may not be used as a pretext for a retaliatory or discriminatory firing in violation of Title VII. Thus, the plaintiffs' discharges are unlawful, despite their wrongdoing, if it is shown that, for impermissible reasons, they were singled out for discriminatory treatment either for discharge from among others equally guilty, or for investigation from among others equally suspected.
 
 
 14
 In this case there are no equally guilty officers with whom Corley and Carter might be compared. It is conceded that Johnson's accusations, by themselves, were not enough to warrant proceedings against any of the seven officers identified; and no officers besides Corley and Carter were caught with clear evidence of payoffs. Rather, the plaintiffs' contention is that the Department's investigation was not intended to catch just any of the eight suspected officers, but was arranged specially to catch Corley and Carter because of their participation in the Taylor suit and in several EEOC charges. They note, in particular, that at the same time Lieutenant Orr asked Johnson and Strahan to notify him of any payoff requests, Corley and Carter (alone of the seven identified suspects) were transferred to a walking beat in the bootleggers' neighborhood.
 
 
 15
 The defendants deny that the transfer had anything at all to do with Orr's bribery investigation. They contend that there is always a walking beat established on the street in question during the Christmas shopping season, and Corley and Carter were assigned to it because of their familiarity with the area. There is good reason to doubt this facile explanation. There is evidence from both Orr and his superior, Chief Tullos, that the purpose of assigning Corley and Carter to the Christmas beat was to "catch them or clear them".
 
 
 16
 The district court, however, did not rely solely on the Department's account of the transfer. It found that even if Corley and Carter were set up for Orr's trap, the plaintiffs did not show that the investigation was intended to create a pretext for a retaliatory firing. We have examined the record closely, and we are convinced that the court's findings are not clearly erroneous.
 
 
 17
 In the first place, the record supports the Department's position that Corley and Carter were not treated disparately in comparison with the other suspected officers. There is a ready explanation why only Corley and Carter were transferred to duty where they would be tempted to solicit payoffs from Johnson and Strahan: the other suspected officers were already on duty that was broad enough to enable them to call on Johnson for bribes. Any of the six other suspects might have conveniently called on Johnson; there was no need to transfer these six other suspects. Corley and Carter, by contrast, were on less lucrative duties not conveniently near Johnson's house: one in community relations, the other investigating traffic accidents. By placing Corley and Carter in a zone of exposure to bribery, so to speak, the Department simply put all the suspects into a similar situation.[3]
 
 
 18
 The Internal Affairs Department of the Police Department conducted a serious investigation to determine if there was evidence of other officers having taken payoffs. Investigating officers questioned known and suspected bootleggers concerning bribery of the police, but Johnson and Strahan, and later Chapman,[4] were the only bootleggers who cooperated with the investigators. Johnson and Strahan agreed to notify Lieutenant Orr if any officers black or white returned for payoffs. Lieutenant Orr showed photographs to Johnson for him to identify other officers who had accepted bribes. He was unable to do so. Because there were no further leads, the investigation bogged down until Johnson called Lieutenant Orr at home on a Sunday, November 26th to advise him that officers had been by the evening before for a payoff. (Orr, Tr. 561). "We were at a standstill until some of them returned to James Johnson because he was the only one that would cooperate with us; so we had nothing on any of them until some of them returned for payoffs." (Orr, Tr. 704). The officers might have been any of the suspects; they happened to be Carter and Corley. Then, when the information became widely known throughout the Police Department, naturally no other officer would return to Johnson for a payoff.
 
 
 19
 Second, there is ample evidence to support the trial court's finding that the Department had good reasons to focus on Corley and Carter in particular. Seven identified officers were inculpated by Johnson's report, but only these two were named in a second, independent informer's report. In addition, Johnson and Strahan made it clear that Corley and Carter were the "worst offenders" in the sense that they had been much more regular and persistent in demanding payoffs than other officers. Carter and Corley were the only names Johnson gave to ATF agent Krohn.[5] And Corley and Carter, alone of the seven, had been disciplined in the past for accepting improper gratuities from a known bootlegger.
 
 
 20
 Finally, an employer cannot be guilty of retaliation for an employee's opposition to discrimination unless he is aware of that opposition. The district court found that neither Orr nor Tullos nor any other officer involved in the plaintiff's apprehension and discharge knew that the plaintiffs had made any charges of racial discrimination. There is nothing inherently implausible in this, and we cannot say that the finding is clearly erroneous.[6]
 
 
 21
 The district court's findings in this case are supported by the evidence, and they in turn support the court's conclusion that the plaintiffs did not establish a violation of section 704(a). Accordingly, the judgment is
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 Section 704(a) provides in part:
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by (Title VII), or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under (Title VII).
 
 
 [2]
 A recent decision of the Supreme Court overruled on this Circuit's rule that the employer must show his legitimate reason by the preponderance of the evidence. Texas Department of Community Affairs v. Burdine, 447 U.S. 920, 100 S.Ct. 3009, 65 L.Ed.2d 1112 (1980). Because the district court correctly found that the defendants met the more rigorous burden, however, the Burdine decision is of no importance here. See also Phillips v. Joint Legislative Committee on Performance Evaluation & Expenditure Review, 5 Cir. 1981, 637 F.2d 1014, 1027 n.22
 
 
 [3]
 The evidence also does not bear out the plaintiffs' contention that the Internal Affairs Division showed unwonted zeal or sophistication in catching Corley and Carter. Here the Division used marked money and a radio transmitter. In other investigations, however, it used fingerprint analysis, hidden cameras, telephone taps, prolonged surveillance, handwriting experts, and laboratory checks of filed-off serial numbers
 
 
 [4]
 Mrs. Mattie Mae Chapman, a former bootlegger, testified that she gave Carter a pearl-handled .22 caliber pistol and a shirt, and that she gave Corley a pearl-handled .38 caliber pistol and a diamond ring. She said that the two officers were in the habit of accepting payoffs
 
 
 [5]
 When asked how he could identify Carter and Corley but could not remember the names of other officers, Johnson explained,
 When you see somebody all the time, you get used to him and you know who he is and remember him ... they be there every weekend just like they was working for me and there wasn't no way in the world to forget them ... they was there all the time.
 (Johnson deposition, Ex. C-3, P. 74, 75, 98).
 
 
 [6]
 There are three sets of charges to be considered:
 a. The plaintiffs' EEOC charges before December 1972. It is standard EEOC procedure in such charges not to reveal the name of the charging party to the employer. The plaintiffs offer no evidence that any of the defendants actually knew that Corley and Carter made such charges; they simply assert that the defendants' attorney knew (from depositions in the Taylor suit), and they seek to impute the attorney's knowledge to the defendants. The key to a retaliation case, however, is actual motive; constructive notice cannot create actual intent to retaliate.
 b. The EEOC charges resulting from the December 2 suspensions. These charges were served on Chief Tullos one hour before he fired Corley and Carter. He testified, though, that he had already made up his mind to fire them before that happened.
 c. The Taylor suit. It was common knowledge in the Department that Corley and Carter were plaintiffs in the Taylor suit. The primary focus of the suit, however, was not on racial discrimination but on the legality of the departmental reorganization as a whole. Indeed, more black officers (nine) participated as intervening defendants than as plaintiffs (three). The defendants testified that they were unaware that Corley and Carter had alleged any racial discrimination in the suit.