Jack K. **MOORE**, Appellee,

v.

**CITY OF CHARLOTTE, NC, Appellant,**

and

**Charlotte Police Department, Defendant.**

No. 84–1430.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 29, 1984.

Decided Jan. 28, 1985.

F. Douglas Canty, Asst. City Atty., Charlotte, N.C., for appellant.

Louis L. Lesesne, Jr., Charlotte, N.C. (Gillespie & Lesesne, Charlotte, N.C., on brief), for appellee.

Before WIDENER, PHILLIPS and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

The city of Charlotte, North Carolina suspended police officer Jack K. Moore and demoted him in rank from a sergeant to a patrolman. According to city officials, the action was a legitimate exercise of disciplinary authority. According to Moore, the action was an unlawful exercise in racial discrimination. On this appeal, we examine the means by which Moore may prove his claim and we review the conclusion of the district court that Moore in fact did prove his claim. Because we find that conclusion to be clearly erroneous, we reverse.

In this case the district court erred in its evaluation of disciplinary violations within the department of police. It equated greater and lesser offenses in a manner that would discourage a department from acting on the reasonable belief of corruption in its midst. In addition, the district court ignored the department's own classification of disciplinary offenses in its assessments of comparable seriousness. These failures together rendered meaningless the requirement of dissimilar sanctions for similar offenses that constitutes a prima facie case of racial discrimination in a Title VII disciplinary case. *See McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273,

283, n. 11, 96 S.Ct. 2574, 2580 n. 11, 49 L.Ed.2d 493 (1976).

## I

On September 11, 1977, Officers D.L. Grose and C.C. Leebrick of the Charlotte Police Department arrested Eddie Winfield Drakeford for driving while under the influence of alcohol. Before the scheduled date of Drakeford's trial, December 9, 1977, Sergeant Jack Moore asked Officer Grose and Officer Ronald Cureton to "help" Drakeford with his case. Cureton subsequently spoke to two witnesses who were essential to the prosecution of Drakeford, attempting to dissuade them from testifying. When neither of the witnesses appeared for trial, Cureton requested the assistant district attorney to drop the charge because the state could not prove its case. The action against Drakeford was accordingly dismissed.

The conduct of Moore and Cureton came quickly to the attention of Major Samuel H. Killman, then commander of the Internal Affairs Division of the Charlotte Police Department, and Killman began to investigate the dismissal of the Drakeford case. When Killman first interviewed Moore on December 16, 1977, Moore admitted that he had contacted the two officers and acknowledged that his actions violated department regulations. The fact of Moore's improper interference was not at that time, and has never been, a disputed issue. The motivation for Moore's improper interference, however, was a less clear question during Killman's investigation. Moore maintained that he had acted solely because of his longtime personal friendship with Drakeford. But Buddy Patterson, a mutual acquaintance of Moore and Drakeford, stated to Major Killman and two other police officers that Drakeford had paid Patterson $450 to help with the ticket, that Patterson had enlisted the aid of Moore, and that Patterson had given the money to Moore when the charge against Drakeford was dismissed.

Allegations of bribery added a new dimension to the case of the Drakeford traffic ticket, expanding the investigation from an internal disciplinary matter to a possible criminal prosecution. This criminal component culminated with trial of Patterson, Cureton and Moore. In the joint trial of Patterson and Cureton in February 1978, the judge of the Superior Court of Mecklenburg County granted a non-suit motion for both defendants on the charge of bribery, and the jury acquitted both defendants on charges of conspiracy to commit bribery. In the trial of Moore in May 1978, the prosecution voluntarily dismissed its case with prejudice when Patterson disavowed the allegations of bribery that he had made to the police investigators.

Meanwhile, in the departmental investigation, the authority to act on Killman's findings lay initially with J.C. Goodman, then chief of the Charlotte Police Department. Under the Charlotte city charter, Goodman could act in three ways: he could end all disciplinary proceedings without punishing Moore, he could order punishment for Moore to the extent of a thirty-day suspension without pay, or he could cite Moore to the Charlotte Civil Service Commission. If Goodman cited Moore to the Commission, that board would hold a hearing, make factual findings, and decide the punishment of Moore, which could include any suspension, demotion, or dismissal.

On March 29, 1978, Goodman suspended Moore without pay and referred his case to the Commission for final disposition. In his citation, Goodman charged Moore with four violations of Civil Service rules and regulations: conspiracy to dismiss the Drakeford case in return for a bribe, influencing of a government official in a matter relating purely to personal advantage, conduct unbecoming an officer, and interference with the proceedings of a trial. On June 21, 1978, the Commission found Moore to be not guilty of the first charge but guilty of the other three charges. The suspension without pay that had begun on March 29 was made effective through June 21, and Moore was demoted from a sergeant to a patrolman.

■ After appealing the decision of the Commission in North Carolina state court, Moore—who is a black man—complained to the Equal Employment Opportunity Commission that the actions of Chief Goodman and of the Charlotte Civil Service Commission were motivated by unlawful racial discrimination. The EEOC notified Moore of his right to sue on May 28, 1982, and Moore filed the present action in the District Court for the Western District of North Carolina on August 25, 1982. The District Court held a bench trial on March 29 and March 30, 1983. In addition to a number of documentary exhibits, the evidence included the testimony of Moore, Cureton, Killman, and Mr. George Hager, to whom we shall return shortly. The court entered its memorandum of decision on July 29, 1983. Finding that "defendant intentionally discriminated against plaintiff on the basis of his race," the court ordered the City of Charlotte to reinstate Moore as a sergeant and to repay his lost wages with prejudgment interest. The city appealed to this court.[1]

## II

■ The decisive issue in this trial, a Title VII suit claiming racially disparate treatment, was the question of whether the defendant's disciplinary actions were motivated by Moore's race. 42 U.S.C. § 2000e–2(a). The district court's resolution of this issue was a finding of fact, *Pullman-Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982), and may be reversed by this court only if the determination was "clearly erroneous"

within the meaning of Fed.R.Civ.P. 52(a). *Id.* at 290, 102 S.Ct. at 1791. The "clearly erroneous" standard of review, as we recently noted in discussing the import of Rule 52(a) for motivational issues in Title VII litigation

> may properly be based upon a conclusion that, without regard to what the 'actual' facts may be, the findings under review were induced by an erroneous view of the controlling legal standard; or are not supported by substantial evidence; or were made without properly taking into account substantial evidence to the contrary or are against the clear weight of the evidence considered as a whole. In sum, these establish that 'clearly erroneous' review is properly focused upon fact-finding processes rather than fact-finding results. The appellate function is to insure that the process shall have been principled; the function is not authoritatively to find the 'facts' first instance, or to affirm or deny that the facts 'found' by the trial court are the 'actual' facts of the case.

*Miller v. Mercy Hospital*, 720 F.2d 356, 361 (4th Cir.1983) (references omitted).

■ Applying this mandate, we are convinced that the fact-finding process in the court below was not properly principled. The appropriate fact-finding process in a Title VII suit for racially disparate treatment has been addressed by the Supreme Court many times. *See especially McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community*

---

1. The city raised three other issues on this appeal: the adequacy of the EEOC right-to-sue letter, the responsibility of the city for the actions of the Civil Service Board, and the availability of prejudgment interest. The essence of the first claim is that the district court lacked subject-matter jurisdiction because Moore's right-to-sue letter was issued by the EEOC rather than by the Attorney General, the authority designated by Title VII for cases in which the defendant is a political subdivision of a state. 42 U.S.C. § 2000e–5(f)(1). We reject this argument under the reasoning of *Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091 (4th Cir. 1982), and *Russell v. American Tobacco Co.*, 528

F.2d 357 (4th Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976). Entitlement to the letter, without actual receipt of it, is sufficient to support federal jurisdiction. *Perdue*, 690 F.2d at 1093. Moore's entitlement is unaffected by any EEOC assumption of Justice Department duties, as Moore may not be penalized for an EEOC failure to fulfill its statutory duties even if such a failure is presented by the administrative division of responsibility between the EEOC and the Attorney General. *Russell*, 528 F.2d at 365.

Because we find reversible error in the district court's determination of liability, we do not reach the other two assignments of error.

*Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). These cases suggest several different ways in which a plaintiff may show, and a court may find, liability under Title VII. A plaintiff may prove the discriminatory intent of the defendant through direct evidence, by introducing statements of the defendant. *Aikens,* 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3. Alternatively, a plaintiff may prove the discriminatory intent through circumstantial evidence. The Court has provided explicit guidance for the order of proof and the allocation of burdens in such cases:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by the preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093 (citations omitted).

Moore offered no direct evidence of discriminatory intent held by any city officials. Proceeding exclusively through circumstantial evidence, he first faced the threshold *Burdine* burden of establishing a prima facie case of discrimination. This burden, the Court has stated, "is not onerous." *Id.* at 253, 101 S.Ct. at 1094. To satisfy the requirement, Moore needed only to raise an inference that city officials acted with discriminatory intent. He might have done so through evidence of a general pattern of racial discrimination in the employment practices of the defendant. *Reynolds v. Abbeville County School District No. 60,* 554 F.2d 638, 642 (4th Cir. 1977). But Moore offered no evidence of any such pattern of discriminatory behav-

ior by city officials. Moore might still have supported an inference of discriminatory intent, and discharged his prima facie burden, by eliminating the most common nondiscriminatory reasons for the disparate treatment. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94. The Court in *McDonnell Douglas* described one model for making this sort of case, a model for plaintiffs who claim to have been rejected in employment applications for discriminatory reasons. 411 U.S. at 802, 93 S.Ct. at 1824.

Moore is in a situation somewhat different from that of the *McDonnell Douglas* plaintiffs. He claims to have been the victim of a discriminatory *disciplinary* decision rather than a discriminatory *hiring* decision. As several courts have recognized, the *McDonnell Douglas* prima facie model is less useful in this context. *See e.g. King v. Yellow Freight System, Inc.,* 523 F.2d 879, 882 (8th Cir.1975); *Burdette v. FMC Corporation,* 566 F.Supp. 808, 814 (S.D.W.Va.1983). The Court specifically anticipated this problem in *McDonnell Douglas,* noting that "the facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Although the particular elements of the *McDonnell Douglas* prima facie model are not apposite here, the purpose behind that model—elimination of the most common nondiscriminatory reasons for the contested decision—remains valid, and that purpose informs the construction of an appropriate model for disciplinary cases.

 The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed. The purpose of the prima facie requirement is therefore served and the requirement met upon a showing (1) that plaintiff engaged in prohibited conduct similar to that of a person of another race,

color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person. *Cf. Burdette*, 566 F.Supp. at 815. These variables, of course, do not exhaust the possible nondiscriminatory reasons for disparate treatment: establishment of a prima facie case is necessary, but not sufficient, in order for the plaintiff to prevail. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2950–51, 57 L.Ed.2d 957 (1978). The defendant might yet advance a permissible rationale for treating the compared employees differently. As in *Burdine*, the defendant bears the burden of introducing such an explanation through evidence. 450 U.S. at 254–56, 101 S.Ct. at 1094–95. The defendant may not discharge its burden by merely restating the offense for which the plaintiff was disciplined; plaintiff must already have known this information in order to make a prima facie case. Defendant's burden is designed to focus the contested issues at trial and to ensure the production of evidence available only to the defendant, such as insight into the discretionary factors underlying defendant's decision to discipline two individuals differently. *See* E. Bartholet, Proof of Discriminatory Intent Under Title VII: United States Postal Service Board of Governors v. Aikens, 70 California L.Rev. 1201, 1212–1219 (1982). If the defendant fulfills this obligation, the plaintiff must rebut the proffered explanation and meet the ultimate burden of proving intentional discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

### III

■ Applying the analytic framework described above to the evidence presented below, we can only conclude that Moore failed to prove a prima facie case of racial discrimination. As previously noted, Moore offered no direct evidence of racially based intent in the disciplinary decisions, and he offered no evidence of a general pattern of racial bias in police department employment actions. His prima facie case rested entirely on an attempt to show that

he had been treated less favorably than white officers who had committed similar misconduct. The district court accepted this contention in its findings of fact, noting

6(c). White officers who committed violations similar to those committed by plaintiff not only were not prosecuted before the Board, but were not disciplined at all.

9. ... a number of white police sergeants have been found guilty by the [Civil Service] Board of violations of severity comparable to those committed by plaintiff, but have received much milder punishment than that imposed on plaintiff.

These findings, however, rest on an unprincipled conception of "similarity" and "comparability," a structural flaw that renders the fact-finding process "clearly erroneous" under the reasoning of *Miller v. Mercy Hospital*, 720 F.2d 356, 361 (4th Cir. 1983). This error is best illustrated through close examination of each of the individual decisions that Moore claims to have been tainted by racial bias.

### (a) *The Decision to Discipline Moore*

Plaintiff relied heavily at trial on his claim that Chief Goodman had not taken any disciplinary action against white Charlotte police officers who were accused of interfering in the prosecution of traffic charges. To show the existence of such officers, plaintiff offered the testimony of Captain George Hager and a July 14, 1978 memorandum from Major Killman to Chief Goodman detailing Killman's "Investigation of Alleged 'Ticket-Fixing.'" Hager, according to plaintiff's interpretation of the evidence, had violated police regulations by voiding two traffic tickets for friends and by securing prosecutorial dismissal of one traffic case. These incidents appeared in the Killman report along with similar anecdotes involving other officers and a brief conclusion that several rules violations were apparent. The staff committee reviewing Killman's investigation recommended that disciplinary action be taken

against Hager and three other officers, but Goodman made no charges against any officer mentioned in the report.

In determining for purposes of Moore's prima facie case whether Goodman had as much cause to discipline Hager as he had cause to discipline Moore, we look first for illumination to the Supreme Court decision in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). The Court there noted that "Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas,* an allegation that other 'employees involved in acts against [the employer] of *comparable seriousness ...* were nevertheless retained ... is adequate to plead an inferential case...." *Id.* at 283 n. 11, 96 S.Ct. at 2580 n. 11 (emphasis retained). This mandate sets for lower federal courts the difficult, but not unfamiliar, task of assessing the gravity of offenses on a relative scale. *Cf. Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637 (1983). As in other contexts, the "comparison can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender." *Id.*

■ When the information that Goodman possessed in the Moore case is projected on this screen of "comparable seriousness" alongside the information presented in the Killman report, the contrast is startling. On March 29, 1977, when Goodman referred Moore's case to the Civil Service Commission, Patterson had not yet recanted his allegations of bribery. Goodman accordingly acted under the reasonable belief that corruption threatened his department; not only police department regulations but the integrity of the legal system had possibly been violated. The reasonableness of Goodman's belief, and the gravity of Moore's suspected offense, are underlined by the simultaneous effort of the district attorney to prepare criminal prosecution of Moore. The charge against Hager and other officers for "fixing traffic tickets" simply pales when compared to the specter of a police sergeant conspiring to commit bribery. The district court, in concluding otherwise, can only have reasoned that the Moore case was of "comparable seriousness" to the Hager case merely because the charge against Moore included in part violations of which Hager stood accused. The court thereby equated a greater offense to its lesser component offense without regard to the disparity in magnitude between the whole and the part. A fact-finding process that overlooks this crucial comparative step is clearly erroneous. *Cf. Roberts v. Collins,* 544 F.2d 168 (4th Cir.1976), *cert. denied,* 430 U.S. 973, 97 S.Ct. 1663, 53 L.Ed.2d 368 (1977).

(b) *The Decision to Cite Moore to the Civil Service Commission*

■ After making the initial decision to take disciplinary action against Moore, Goodman faced a choice between personally ordering a punishment and citing Moore to the Civil Service Commission for review and possible punishment. Goodman referred the case to the Board, a course which, as the district court noted, "carried with it the possibility of significantly more severe sanctions than could be imposed by the Chief of Police." The plaintiff contended below that this decision to expose Moore to greater risk represented an act of racial discrimination by Goodman. The district court, finding a failure to refer the cases of white officers who committed violations similar to those committed by Moore, accepted that contention.

This conclusion finds no support in the record. Goodman accused Moore of four violations of four Civil Service regulations:

(1) Rule No. 400–2: "Every member of the department shall obey the laws and ordinances which he is obligated to enforce," *viz.,* Rule No. 500–7(v): "receiving bribes and money or other valuable things."

(2) Rule No. 300–20: "A member shall not attempt to influence the decision of Government officials in matters relating to purely personal advantage."

(3) Rule No. 500–7(h): "Conduct unbecoming an officer."

(4) General Order No. 4, Section V, Paragraph A: "An officer of the Charlotte Police Department shall not seek or request (of any court officer) a nol pros disposition of any trial case, or interfere in any way with the due process proceeding of the court."

In determining whether Moore raised an inference of bias on the basis of Goodman's decision to refer the case, the dispositive reference point is Goodman's record in cases of white officers accused of violating the same regulations. The answer to that question is clear:

(1) Rule No. 400–2: The record shows four other instances of officers, all white, whom Goodman disciplined for violation of Rule No. 400–2. In all four of these instances, Goodman cited the case to the Commission.

(2) Rule No. 300–20: The record reveals no other officer disciplined for violation of Rule 300–20. Goodman did, however, discipline three officers, all white, for violation of the most analagous regulation, Rule No. 300–31.[2] Goodman referred all three of these cases to the Commission.

(3) Rule No. 500–7(h): Goodman on four other occasions disciplined officers, all white, for "conduct unbecoming an officer" in conjunction with a related rules violation. In three of these four instances, Goodman referred the case to the Commission.

(4) General Order No. 4, Section V, Paragraph A: In addition to Moore, Goodman took disciplinary action against one other officer—a white man—for violation of this paragraph. He referred that case to the Commission.

This evidence demonstrates by an overwhelming preponderance that the violations for which Goodman disciplined Moore were violations for which Goodman consistently cited white officers to the Civil Service Commission.

That consistency escaped notice below because the district court in its findings of fact attempted comparisons that ranged widely through the police department code of conduct, reaching ad hoc judgments about the reprehensibility of Moore's violations relative to other officers' use of profanity, abuse of alcohol, and absence from work without leave.[3] These conclusions acknowledge no deference to the police department classification of violations, no application of the *Solem v. Helm* criteria for comparing offenses,[4] and in short, no basis whatsoever for the asserted correspondence of conduct. Without attempting to establish a single process of comparison for the vast variety of disciplinary situations, we may safely say that in this case a principled determination of "comparable seriousness" required at least initial deference to the system of offenses created by the police department, an administrative agency of the city of Charlotte.[5] The departmental scheme may of course be disregarded if arbitrary or capricious. But in here judging "similarity" without the disci-

---

**2.** Rule No. 300–31 states that "A member shall not attempt to use his official position, badge, or credentials for personal or financial gain."

**3.** Because the district court reported its findings of fact in conclusory statements rather than detailed analyses of the evidence, we can only speculate about the specific incidents on which the court based its comparisons. We have reviewed all comparisons available from the evidence offered by the plaintiff, examples of which are given above.

**4.** We recognize that *Solem v. Helm* involved the procedurally different case of an Eighth Amendment challenge to a state criminal sentence.

Although the standard of review may change with the transition from the criminal to the civil context, the considerations relevant in *Solem* remain relevant when comparing offenses in private disciplinary cases.

**5.** This limited deference does not bring "comparable seriousness" to the level of "precise equivalence" that the Supreme Court has said to be unnecessary in *Santa Fe,* 427 U.S. at 283 n. 11, 96 S.Ct. at 2580. Conduct violative of a single police regulation may vary considerably in different cases. The other alleged violations of Rule No. 400–2, for example, involved not bribery but larceny, drug distribution, and receiving stolen goods.

pline of that initial guidance and without the application of the *Solem* criteria, the fact-finding process strayed into clear error.

(c) *The Decision Not to Withdraw the Case from the Board*

 Patterson retracted his allegation of bribery on May 8, 1978, after the March 29 citation by Goodman but before the June 21 decision by the Commission. As the district court noted, Goodman retained the authority to withdraw the Moore case from the Commission docket in the period between the Patterson recantation and the Commission ruling. Plaintiff argued strenuously at trial that Goodman revealed an underlying racial motive by failing to exercise this authority. In support of this argument, plaintiff relied heavily on the disciplinary case of Sergeant T.C. Johnson, a white officer. Goodman cited Johnson to the Commission for violation of Rule No. 400–2 (failure to obey state law), and for the underlying violation of North Carolina larceny statutes. A jury acquitted Johnson of the state charges in a full criminal trial, after which Chief M.M. Vines, Goodman's successor in the Charlotte Police Department, withdrew Johnson's pending case from the Civil Service Commission and suspended him for fifteen days for conduct unbecoming an officer.

The Johnson incident, however, does not suggest disparate treatment of black officers and white officers. When criminal charges against Johnson dissolved with his acquittal, no unaffected charges remained on which the Commission could act. Chief Vines then instituted the charge of "conduct unbecoming an officer," a disciplinary sanction that the Chief of Police administered personally in all nine of the cases on the record—involving both black and white officers—in which it was the only basis for action. In contrast, Moore faced citation for three rules violations notwithstanding the bribery allegation. And, as noted above, these charges by themselves rou-

tinely mandated citation to the Civil Service Commission. As the decision of Chief Vines in the Johnson case and the decision of Chief Goodman in the Moore case thus arose in very different disciplinary contexts, the disparate treatment of Johnson and Moore cannot logically support a prima facie inference of racial discrimination.

(d) *The Decision to Suspend and Demote Moore*

On June 21, 1978, the Charlotte Civil Service Board exonerated Moore on the bribery charge but found him guilty of the other three rules violations. By a two to one majority, the Board voted to suspend Moore without pay for eighty-five days and to demote him from the rank of sergeant to that of patrol officer. In reviewing this decision, the district court found as fact that white sergeants guilty of comparable violations had received less severe treatment from the Board than Moore had received. The district court concluded from this finding that Moore had raised a prima facie inference that the Board decision was motivated by racial animus.

For the reasons suggested by our discussion of the other contested decisions, we cannot accept the premise of "similarity" implicit in the finding that comparable white offenders were treated more leniently by the Board. Inspected under a principled process of analogy, the record simply reveals no comparable white offenders. *Cf. Corley v. Jackson Police Department,* 639 F.2d 1296, 1299 (5th Cir.1981). The Board punished Moore for violation of Rule No. 300–20 (attempt to influence government officials for personal gain), Rule No. 500–7(h) (conduct unbecoming an officer), and General Order 4, Section V, Paragraph A (interference in the trial process). According to the evidence presented below, the Board has found no other officer, white or black, guilty of violating Rule No. 300–20 or General Order 4, Section V, Paragraph A.[6] The Board has apparently pun-

---

6. As indicated in section III(b), the Charlotte police chief has apparently cited no other offi-

cer for violation of Rule No. 300–20. Of the three officers mentioned for their citation under

ished two white officers for violation of Rule No. 500–7(h). It suspended J.L. Ruckart for twenty days without pay for a single violation of the rule, and it suspended B.W. Gaddy for ninety days for two violations of the rule in conjunction with related offenses involving conduct subversive of force discipline, making a false statement, and neglecting to route seized evidence through proper channels without delay. These cases, comparable only to a part of the basis for the punishment of Moore, do not indicate that the Board disposition of his case conflicted with its disposition of cases involving white officers. If anything, the ninety-day suspension ordered in the Gaddy incident—which in the improper custody of evidence involved a loosely related problem of interference in the criminal process—suggests a consistent concern by the Civil Service Board with limiting the influence of police officers in the post-arrest administration of justice.

■ Beyond the suspension, the district court found that "no white sergeant found guilty of a rules violation has ever been demoted by the Board." As an abstract proposition, this statement is correct. In fact, the record shows no other sergeant or higher officer, white or black, to have been demoted by the Board for any cause. But then, the record also shows no other person found guilty by the Board of abusing his position in an attempt to persuade government officials to forebear prosecution of a criminal trial. Given this fact that Moore's violations were as singular as his punishment, in light of the consistent pattern of disciplinary administration with respect to the rules classifications and in light of the reasonable proportionality of this sanction to the offenses admitted, an inference of racial intent based solely on the uniqueness of Moore's demotion is clearly erroneous.

### IV

We recognize that a reviewing court need rarely address the sufficiency of a

prima facie case after a full trial on the merits of a complaint. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). The *Aikens* exhortation to proceed directly to the ultimate question of discrimination *vel non* does not, however, apply in this case for two reasons. First, *Aikens* emphasizes that "where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Id.* at 715, 103 S.Ct. at 1482. But here the defendant did not meet its burden of production. The evidence on which plaintiff seeks to raise an inference of racial discrimination is therefore not only relevant but crucial, for the force of that inference is the sole basis for the finding of intentional discrimination. Second, as the court observed in *Burdette v. FMC Corporation,* the Court of Appeals for this circuit has not adequately clarified the showing that a plaintiff need make to establish a prima facie case in a disciplinary Title VII action. 566 F.Supp. 808, 814–815 (S.D.W.Va.1983). We do not intend here to replace that void with an exclusive mechanical model for handling these varied and delicate cases, but we do hope today to provide some guidance to the trial courts.

■ The essence of that guidance is that a conclusion that individuals have received discriminatory disparate treatment may be supported only where the notion of comparability is informed by sound, articulated principles that will enable appellate courts to examine the fact-finding process. In this case, the district court found similarity among different incidents without the discipline of such reviewable principles. Because proper attention to these axes of comparison dispels any suggestion of racial

---

the most closely analogous rule, No. 300–31, the record includes the Board finding in only one case. That officer, found guilty of violating Rule No. 300–31 and Rule No. 400–2 (failure to obey state law) was discharged from the force.

The record does not indicate the Board disposition of the other incident involving an officer cited for violation of General Order 4, Section V, Paragraph A.

animus in the challenged police decisions and because the plaintiff offered no other evidence, either direct or indirect, that even hinted at an improper motive on the part of the defendant, we must reject the inference of racial discrimination drawn by the district court as clearly erroneous.

REVERSED.