831 F.2d 1058
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Areatha TROUBLEFIELD, Plaintiff-Appellant,
v.
John LEHMAN, Secretary of the Navy, Defendant-Appellee.
 No. 86-3829.
 United States Court of Appeals, Fourth Circuit.
 Submitted June 24, 1987.
Decided Oct. 26, 1987.
 
 Appeal from the United States District court for the Eastern District of North Carolina, at New Bern. James C. Fox, District Judge. (C/A 85-16-CIV-4).
 Gene B. Gurganus on brief, for appellant.
 Samuel P. Currin, United States Attorney, Paul M. Newby, Assistant United States Attorney on brief, for appellee.
 E.D.N.C.
 Before DONALD PHILLIPS, ERVIN and WILKINSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Areatha Troublefield, a school teacher, appeals the entry of summary judgment against her on her Title VII claim for discriminatory and retaliatory discharge by her employer, the U.S. Navy. Although the district court earlier had denied the Navy's motion for summary judgment, it granted a renewed motion because on the more fully developed record there was no genuine issue of material fact whether there was racially discriminatory or retaliatory motivation behind the discharge. Because we agree that the development of the evidence during the interval between the original and renewed motions for summary judgment demonstrates that, as a matter of law, Troublefield was not discharged because of her race or for illegal retaliatory reasons, we affirm.
 
 
 2
 * Areatha Troublefield was discharged from her employment by the Navy as a teacher in the Marine Corps' Camp Lejeune Dependent School System (CLDSS), for "unacceptable performance." Just before her discharge she had received a formal warning specifying her deficiencies and a notice of proposed separation from employment for inefficiency, stating the specific ways in which her performance had fallen short.
 
 
 3
 Troublefield originally worked for the CLDSS as a fifth grade teacher at Tarawa Terrace II (TT II) during the school years 1976-77 and 1977-78. During her first year there, she received a letter of caution for having spanked three children and struck another in violation of the school system's rule against corporal punishment. On another occasion, she received a letter of reprimand for having improperly disciplined a student. Denying the incident on which this letter was based, she had filed an EEO complaint alleging racial harassment. That complaint was settled in September 1979, and pursuant to the settlement the letter of reprimand was changed to a letter of caution. Troublefield then was assigned to teach fourth grade at the Stone Street School (SSS), the first vacancy in the CLDSS away from TT II for which she was qualified. At the time of her assignment to SSS, several parents of SSS students expressed reservations about Troublefield's competence, but she nonetheless was installed in that position where she remained until her termination in 1980.
 
 
 4
 Following her termination, she brought this action claiming that her discharge was racially discriminatory and retaliatory for her earlier filing of an EEOC complaint.
 
 
 5
 The Navy first moved for summary judgment on August 1, 1985, but the district court denied the motion, finding a genuine issue whether Troublefield's discharge in 1980 resulted from invidious discrimination or rather from legitimate concerns about her incompetence. Although the court at that time noted that there was evidence of specific concerns about Troublefield's competence, it also took notice of evidence that she was treated differently from other white teachers in various ways that might be thought to be racially inspired, and that the record contained affidavits of fellow teachers opining that Troublefield was a victim of racial harassment and discrimination. At a pre-trial conference set after denial of summary judgment, Troublefield's attorney withdrew, stating that he no longer could rely in good faith upon the affidavits he had filed in opposition to the summary judgment motion nor could he present in good faith the live testimony of the affiants. The Navy thereupon moved to strike the affidavits and renewed the motion for summary judgment.
 
 
 6
 The magistrate who considered these motions did not recommend striking the affidavits but did recommend granting the renewed motion for summary judgment. He embodied this recommendation in a lengthy and thorough memorandum which did not rely upon the alleged perjury in Troublefield's affidavits but rather upon party stipulations and forecasts of additional evidence adduced since the time of ruling upon the original summary judgment motion. Based upon a de novo review of the record the district court adopted the magistrate's recommendation and granted summary judgment to the Navy.
 
 
 7
 This appeal followed.
 
 II
 
 8
 The crucial issue on both summary judgment motions was, of course, whether there was a genuine issue of material fact regarding the assertion of discriminatory or retaliatory intent behind Troublefield's discharge. The evidence before the district court at the time of the first summary judgment motion included expressions of concern by parents of SSS students about Troublefield's competence when she was transferred to that school in 1978. There also was evidence, through official and unofficial reports and letters written by school personnel and parents, of a number of deficiencies in her performance, specifically (1) lack of preparation of lesson plans, (2) lack of proper classroom instruction, (3) lack of proper student evaluation, (4) improper discipline, (5) tardiness, (6) failure to comply with leave policy, and (7) failure to cooperate with coworkers and administrative personnel. Although this evidence strongly suggested that Troublefield's discharge was the result of legitimate, non-discriminatory concerns, there also was evidence that she was treated differently than all other teachers at SSS from the beginning. For example, parents were permitted to sit in her classroom, detailed notes were kept regarding her inadequacies, and students were questioned about her performance. Affidavits of fellow teachers submitted by Troublefield at the time of the first summary judgment motion expressed opinions that her treatment was the product of racial discrimination and that she was a good teacher. Although the district court expressed serious doubt about the merits of Troublefield's claim--the court even suggested that she strongly consider settlement--it applied the McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); see Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir. 1985), proof scheme and found summary judgment inappropriate. Even so, the court commented that the Navy's "evidence is substantial and abounds with legitimate, non-discriminatory reasons for [the] discharge."
 
 
 9
 According to the magistrate's recommendation upon the renewed motion, the record had increased "immeasurably" since the district court's denial of the first summary judgment motion. Since that time Troublefield had responded to interrogatories and requests for admissions, the Navy had deposed Troublefield's affiants, and the parties had stipulated to critically relevant facts. In these materials, Troublefield conceded that parents of students assigned to her at SSS in 1979 were concerned about her competence, that upon her arrival at the school she was welcomed with coffee and doughnuts and given a "buddy," a white fourth grade teacher on her team, that she replaced a white teacher, and that the head of her team was black. Another set of stipulations indicated that Troublefield had met in November 1979, with the parents of one of her SSS students, who reported that the teacher could not remember where their child sat in the classroom or that the child was left-handed and that Troublefield's sloppy recordkeeping had caused her to misplace students' homework papers and then accuse the children of not submitting the work. Troublefield had also stipulated in the interim that during her school duty hours she had moved a florist shop that she owned and that during school hours on January 8, while she was on sick leave, the principal of SSS had found her in her florist shop.
 
 
 10
 Other new evidence before the magistrate came in further stipulations and answers to requests for admissions. This evidence included the following: (1) Troublefield sometimes engaged certain students to correct the papers of other students; (2) she told her students to "shut up"; (3) she referred to at least one female student as if the student were male on at least one occasion; (4) on one occasion she told the principal of SSS that she had told a student's parents on the telephone that she would sue the parents for slander because they had complained of her telling her students to "shut up"; (5) on at least one occasion, Troublefield allowed students to read while on top of closets and filing cabinets, and at least one student read while on top of a closet which was over six feet tall and near a glass window; (6) she submitted her weekly lesson plans to the principal's office, due on the prior Friday for the following week, after 8:00 a.m. Monday morning of the week planned for, on some occasions, and on at least one occasion, her plans were submitted two days late; (7) on one occasion a substitute teacher, after substituting for Troublefield, submitted a form to the principal stating that Troublefield's lesson plans were not detailed enough; (8) Troublefield taught the first science lesson in January 1980, but recorded science grades for some of her students in October, November, or December of 1979; (9) though teacher working hours were 7:30 to 3:30, in February 1980, Troublefield arrived after 7:30 on several occasions, so that the principal gave her a notice that she should arrive at school on time; (10) on at least one occasion, Troublefield's team leader had to remind her that she was not properly assuming her collateral duty of overseeing students on the playground; (11) parents of students complained to the principal about Troublefield; and (12) she returned student papers generally every 4 to 8 weeks. The new evidence also included affidavits of parents, students, and co-workers regarding Troublefield's deficiencies.
 
 
 11
 In evaluating this new, more specific, uncontroverted evidence, the magistrate applied to the discriminatory discharge claim the McDonnell Douglas proof scheme, noting that in this context a prima facie case required proof that (1) Troublefield did not engage in prohibited conduct and did not poorly perform her job, or, if she did, that her performance was similar to that of a person of the white race; (2) her harassment and discharge were more severe consequences of her deficiencies than resulted to the white person, and (3) she was replaced by a non-minority worker with comparable or lesser qualification. See Moore v. City of Charlotte, 754 F.2d 1100, 1105 (4th Cir. 1985); Green v. Armstrong Rubber Co., 612 F.2d 967, 968 (5th Cir. 1980). For her retaliatory discharge claim, the magistrate held that she must establish (1) that she engaged in a protected activity; (2) that appellee took adverse action against her; and (3) that there was a causal connection between the protected activity and the adverse action. See, e.g., Ross, 759 F.2d at 365.
 
 
 12
 The district court, in adopting the magistrate's recommendations, concluded that the new evidence indisputably showed that Troublefield had not satisfactorily performed her duties and thus failed to satisfy the first element of the discriminatory discharge prima facie case. The court also relied upon the lack of relevant evidence to support a finding that similarly-performing white employeeS were treated more leniently, noting that no other employee exhibited the deviations from standards that Troublefield did. Finally, the court agreed with the magistrate that even assuming Troublefield had proved her prima facie case, she had failed to disprove as pretext the Navy's explanation that it had terminated her because of her poor performance. The court also agreed with the magistrate that the evidence indisputably showed that the discharge was not a retaliatory one, but was for the reasons advanced by the Navy that were never seriously drawn in question.
 
 
 13
 In reaching these conclusions, the court and the magistrate did not rely upon the alleged perjury in the affidavits offered by Troublefield that were later discredited by the withdrawal of Troublefield's attorney. Instead, the court relied upon the evidence developed since the first summary judgment ruling. This evidence provided sufficient reason that "the prior ruling [was) no longer applicable," see 6 Moore's Federal Practice, SS 156.14, at 363-64; Bon Air Hotel, Inc. v. Time, Inc., 426 F.2d 858 (5th Cir. 1970); Burns v. Massachusetts Institute of Technology, 394 F.2d 416, 418 (1st Cir. 1968); Wright & Miller, Federal Practice and Procedure, SS 2728, and that renewed consideration of the summary judgment motion was therefore proper.
 
 
 14
 We agree that the new evidence demonstrated that there was no genuine issue whether Troublefield was discharged discriminatorily or in retaliation for having filed an EEO complaint.
 
 
 15
 AFFIRMED.