**Alton A. WALL, Plaintiff,**

v.

**THE CITY OF DURHAM, Defendant.**

**No. 1:00CV00718.**

United States District Court,
M.D. North Carolina.

Oct. 15, 2001.

Lynn Fontana, Durham, NC, for Plaintiff.

Thomas H. Lee, Jr., Joel Miller Craig, Newsom, Graham, Hedrick & Kennon, Durham, NC, Patrick W. Baker, Office of City Atty., Durham, NC, for Defendant.

## MEMORANDUM OPINION AND ORDER

ELIASON, United States Magistrate Judge.

This case comes before the Court on defendant's motion for summary judgment and on plaintiff's motion to strike an affidavit submitted by defendant in support of its motion for summary judgment. Those motions have been fully briefed and are ready for decision.

### Facts

The facts, as follows, are either undisputed or are stated in the light favorable to the plaintiff considering all of the evidence. Plaintiff is an African American

who began working for defendant as an automotive service worker in defendant's Fleet Maintenance Department in 1986. Over time, he received several promotions and reached the position of Master Mechanic. Prior to July of 1998, plaintiff had no active oral or written warnings in his personnel file and his performance evaluations had been "outstanding" for a number of years.

During 1994, several incidents occurred which plaintiff claims are relevant to this case. First, in early 1994, plaintiff and thirteen other employees in Fleet Maintenance signed a petition which complained that African American employees in the Department were being treated unfairly and did not receive proper promotional opportunities. Although the petition was resolved through mediation, an article dealing with the petition appeared in a local newspaper. The Director of Fleet Maintenance, Kent Cash, saw the article and, according to plaintiff, stated that he did not like seeing his name in the paper. Of the thirteen employees who signed the petition and who have been identified by the parties, three still work in Fleet Maintenance, four have been terminated, two were transferred due to budget cuts, and four retired or quit voluntarily. Of the twenty identified Fleet Maintenance employees who did not sign the petition, eight are still employed in Fleet Maintenance, four were terminated, one transferred voluntarily to another department, and seven retired or quit voluntarily.

In September of 1994, plaintiff was suspended for five days without pay by Ricky Beck, his supervisor at the time, for insubordination. As plaintiff points out, Beck, who is Caucasian, occasionally socialized with Cash, who is of mixed race,[1] at that time.[2] The incident began when Beck asked plaintiff to replace a broken seat with a seat from a wrecked car. After plaintiff realized that he could not remove all of some broken glass that was in the replacement seat, he obtained a different replacement seat from another car. An African American employee named Samuel Brown passed by, told plaintiff that the seat was unsatisfactory, and asked whether or not plaintiff could find another one. When plaintiff ignored him, Brown went to Beck who approached plaintiff and insisted that he remove the seat. After a back and forth conversation on the subject, plaintiff refused to replace the seat and was suspended by Beck. Plaintiff filed a grievance and the suspension was overturned after a hearing.

The third, and final, incident which occurred in 1994 is referred to as "the blue light incident." In July of 1994, Rusty Phelps and Wayne Shotwell, two Caucasians working in Fleet Maintenance test drove a police vehicle and activated the blue light. A newspaper article appeared

---

1. Cash testified at his deposition that he is at least one fourth Native American because both of his maternal grandparents were one-half Cherokee. Also, one of his great, great grandfathers on his father's side of the family is known in the family as having been a "man of color." Cash is unsure whether this meant that he was Native American or African American. (Cash Dep. at 169) While plaintiff (or defendant) may want to classify Cash as Caucasian, his racial heritage is mixed and he so regards himself. (*Id.* at 170) This situation provides a striking demonstration of the difficulties of defining race in modern society and raises the question of who, if anyone, gets to dictate a person's race. Cash's godmother, with whom he is close, is black. *Id.*

2. The two no longer socialize. Cash testified at his deposition that he and Beck stopped talking after the hiring board, of which Cash is a member, promoted an African American employee, rather than Beck. This led to Beck filing a discrimination charge with the Equal Employment Opportunity Commission. (Cash Dep. at 105–106, 135–137)

claiming that an unidentified citizen made a report of the incident to a K–9 officer, claiming that the two had pulled her over and then driven away. How much of this report reached management in Fleet Maintenance and when it reached them is murky at best. However, a few things are apparently clear. Some level of investigation was conducted by Cash and Beck. Phelps and Shotwell claimed that the activation of the blue light was accidental and no evidence showing otherwise was ever produced. Based on this, Phelps was warned for driving the police car off of the approved test route .[3] No other discipline was handed out because of "the blue light incident." At the time of his grievance for his insubordination suspension, plaintiff brought "the blue light incident" to the attention of a local paper and an article appeared on the matter. Plaintiff claims that after the article appeared, Cash called him aside and told him in a "threatening manner" " 'your co-workers don't like you going" to the newspaper. What if a car were to fall on you? You'd want one of them to get it off of you, wouldn't you?" ' (Plaintiff Aff. at ¶ 4)

Following the incidents in 1994, things remained fairly peaceful for plaintiff in Fleet Maintenance until the morning of July 16, 1998. On that day, an incident occurred which has been the subject of a great many statements made by several witnesses. Not only do these witnesses' stories differ from each other in many respects, but some of them have given multiple, inconsistent statements. Whether this is due to the effect of the passage of time on memories, the differing perceptions of the persons involved, the varied circumstances under which the statements were given, or simple untruthfulness on the part of the witnesses, it is not the role of the Court to say. Instead, the Court will simply give the version of the facts most favorable to plaintiff, which appears to be the version set out in his deposition.

Sometime between 11:00 and 11:30 that morning, Jerry Henderson, an African American who was repairing the roof of Fleet Maintenance, stopped to talk to plaintiff. While talking, he reached into the nearby work area of Phelps, picked up a pair of heavy duty ear muffs used for noise protection, put them on his head, and then put them back. Later, plaintiff saw the ear muffs in the trash and asked Phelps why he threw them away. According to plaintiff, Phelps responded, "Because that guy had them on," while pointing in the direction Henderson had gone. Plaintiff states that as he walked away, Phelps followed him, got very near him and began pointing his finger in plaintiff's face only a few inches from his eyes while telling plaintiff to mind his own business. Plaintiff claims that when he told Phelps to get his finger out of his face, Phelps responded by saying "Na, na, na" and wiggling his finger. At this point, plaintiff pushed Phelps away from him, causing Phelps to fall into a nearby wall. Phelps, who was unhurt, then got back into plaintiff's face and, according to plaintiff in his deposition, even touched plaintiff with his chest. After a brief exchange of words, plaintiff claims that he told Phelps that he had problems and that he was prejudiced and then walked away. Plaintiff says that he immediately told his supervisor, R.L. Harris, about the incident. Harris seemed unconcerned, and plaintiff continued with his workday.

Just after the incident, two written statements were given to management in

---

3. Plaintiff notes that Phelps' personnel file does not support this because no warning is listed in the file. However, Phelps and Cash both state that such measures were taken and no contrary evidence has been presented. (Phelps Dep. at 13, Pl. Brf. Ex B)

Fleet Maintenance. First, Phelps himself told Cash about the incident. Cash asked Phelps to give a written statement and he did so. That statement says that he threw his earmuffs away after a construction worker put them on because of concerns over personal hygiene. It states that plaintiff approached Phelps asking why they were thrown in the trash and that Phelps told him to stay out of his business. Plaintiff responded by pushing Phelps into the wall and stating that Phelps was prejudiced.

Tina Beasley also gave a short statement. She wrote that she came out of the supply room and saw Phelps pointing his finger in plaintiff's face. Plaintiff had his voice raised and twice told Phelps to get his finger out of his face. Beasley wrote that plaintiff then pushed Phelps, that the two had a few more words with each other, and that Phelps walked away.

After receiving the statements from Phelps and Beasley, Cash met with Harris and Randy Fletcher who was the Fleet Operations Manager for first shift. Accounts of the meeting vary, but what is clear is that Cash made the decision that plaintiff's push of Phelps violated defendant's Workplace Violence Policy and that termination was appropriate. Whether and to what extent Harris and Fletcher agreed with this decision is unclear, as is their level of input into the decision.

In any event, Fletcher prepared a termination letter and recommendation of dismissal and Fletcher and Harris went to City Hall. Harris spoke with Kay Ferguson in Human Resources, while Fletcher took other paperwork to the office of the City Manager. As Ferguson explains in her affidavit, Human Resources performed a "technical review" of Cash's decision to determine whether it was consistent with City policy. Because Cash had determined that plaintiff had violated the Workplace Violence Policy and because this policy allowed termination for violations, the termination recommendation passed review. Ferguson did tell Harris that he needed to get statements from all witnesses and not just one side of the story. Cecil Brown of the City Manager's office spoke with Fletcher. After being told that one employee had pushed another, Brown responded that he must have decided that he didn't want to work for the City any more. He then signed the necessary paperwork.

When Fletcher and Harris returned to Fleet Maintenance, Harris, in an apparent attempt to follow Ferguson's directive to get both sides of the story, asked plaintiff to write down his version of events. In that statement, plaintiff claimed that he had asked Phelps why he had thrown away his earmuffs and that Phelps replied that it was because "that guy put them on his head." When plaintiff questioned whether that was a reason to throw them away, Phelps told him it was none of his business and put his finger in plaintiff's face. Plaintiff stated that he twice asked Phelps to remove his finger and that Phelps responded by wiggling it back and forth. Plaintiff admitted that he then pushed Phelps, told him not to put his finger in his face again, and told him that he was prejudiced. Harris did not get statements from three other witnesses, Rex Turner, Ike Johnson, and John Freeman.[4] Also, prior

4. Ike Johnson did make a short statement at some point. The undated statement says only that he saw plaintiff push Phelps, that he advised plaintiff to apologize, and that plaintiff bragged about the push rather than apologize. There is some question as to whether this statement was collected before plaintiff's termination or later around the time of his grievance hearing. For the purposes of deciding the summary judgment motion, the Court will assume that it was not obtained until after plaintiff was fired.

to Harris getting plaintiff's statement, Cash called Human Resources and asked why he had to get further statements when it was clear that plaintiff had pushed Phelps.

After giving his statement, plaintiff clocked out and left work. Sometime later on the same day, when he returned to pick up some sheet tin scraps, he was given his notice of termination. After being terminated, plaintiff initiated a grievance procedure. Cecil Brown presided over the hearing and upheld plaintiff's termination. Plaintiff then had less formal meetings with Assistant City Manager John Pederson and City Manager Lamont Ewell, who is an African American. Each refused to reverse the termination and plaintiff then instituted proceedings which have now led to this lawsuit.

In his complaint, plaintiff raises two theories which would entitle him to relief under 42 U.S.C. § 2000e, *et seq.* (Title VII). First, he claims that defendant discharged him on the basis of his race. As the case has developed, it has become clear that his specific allegation is that he was disciplined more harshly than similarly situated Caucasian employees. Plaintiff's second theory of recovery under Title VII is that his discharge was a form of illegal retaliation for his outspokeness concerning issues of race in Fleet Maintenance. Plaintiff also raises a claim under 42 U.S.C. § 1981 alleging that he was discharged because of his race.

### Motion To Strike

■ Before dealing with defendant's motion for summary judgment, the Court must first decide plaintiff's motion to strike in order to determine which evidence will be considered at summary judgment. Plaintiff has requested that the Court strike the affidavit of Althea Bell, claiming that all or part of the affidavit is not made on personal knowledge, does not contain admissible evidence, does not affirmatively show that Bell is competent to testify on matters contained in the affidavit, conflicts with the testimony of one of plaintiff's affiants, is irrelevant, confusing, and unfairly prejudicial, is not helpful, and is not sufficiently detailed. Despite this laundry list of alleged problems with the affidavit, only a few small portions of the affidavit are mentioned specifically.

Having reviewed Bell's affidavit in light of plaintiff's complaints, the Court finds that they are largely unfounded. For instance, it is clear that Althea Bell's affidavit does purport to be based on her personal knowledge. More importantly, her affidavit deals with matters in which defendant's Human Resources (HR) Department was involved. Given Bell's twenty-six year employment with that Department, the fact that she was Assistant Director of the Department at the time the events that she speaks about occurred, and her current position as Director, it is entirely believable that she has the knowledge she claims. The Court also notes that striking Bell's affidavit would have little, and perhaps no, effect on this litiga-

---

John Freeman's affidavit has been submitted by defendant. In it he states that Phelps approached plaintiff after their argument began, that his fingers were only a few inches from plaintiff's eyes, and that plaintiff pushed Phelps after telling him to get his hands out of his face. Freeman opines that Phelps was clearly the aggressor in the incident. He also claims that Beasley was not in the area when the incident occurred, but instead came out of a supply room as it ended. Freeman asserts that he did not see her watching out of the window of the supply room as she claimed to have done in a statement she made prior to plaintiff's grievance hearing.

No statement from Rex Turner is in the record.

tion since the affidavit largely duplicates evidence found elsewhere in the record (including plaintiff's submissions). Finally, some of plaintiff's complaints, such as the fact that one of his witnesses disagrees with Bell or that part of the affidavit is irrelevant if a contested point of law is decided in plaintiff's favor, are not valid reasons to strike an affidavit. To the extent that plaintiff has pointed to areas where the affidavit is marginally relevant, weak, general, or lacks full explanation of the events it discusses, these problems may well affect the weight given to the affidavit on certain points.[5] However, the affidavit need not be stricken.

### Motion For Summary Judgment

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir. 1990). When opposing a properly supported motion for summary judgment, the party cannot rest on conclusory statements, but must provide specific facts, particularly when that party has the burden of proof on an issue. *Id.* The mere fact that both parties request summary judgment does not necessarily mean that the material facts are undisputed. *World–Wide Rights Ltd. Partnership v. Combe Inc.,* 955 F.2d 242, 244 (4th Cir.1992). "The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, *in the form of admissible evidence,* that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) (emphasis added). A mere scintilla of evidence will not suffice. Rather, there must be enough evidence for a jury to render a verdict in favor of the party making a claim. A few isolated facts are not sufficient. *Sibley v. Lutheran Hosp. of Maryland, Inc.,* 871 F.2d 479 (4th Cir.1989).

### Disparate Treatment

■ Proceeding now to the merits of plaintiff's racial discrimination claims, he first raises a claim of disparate treatment. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discharge an employee or discriminate in "compensation, terms, conditions, or privileges of employment" because of race. 42 U.S.C. § 2000e–2(a). In order to prove a claim of racial discrimination, plaintiff can proceed with either direct evidence or with circumstantial evidence under the method of proof established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Moore v. City of Charlotte, N.C.,* 754 F.2d 1100, 1104–05 (4th Cir.), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). When, as in this case, there is a lack of direct evidence of discrimination, the *McDonnell Douglas* scheme allows a plaintiff's case to go forward by shifting the burden of proof to the defendant after the plaintiff has established a *prima facie* case. To establish a *prima facie* case, a plaintiff must prove a set of facts from which a reasonable jury could conclude that in the absence of any further explana-

---

5. Many of the same accusations made by plaintiff concerning the strength and detail of Bell's affidavit could also be justifiably leveled at the affidavit of Kay Ferguson, which was submitted by plaintiff, and even at plaintiff's own affidavit. Just as the weight of Bell's affidavit is lessened for the reasons put forth by plaintiff, Ferguson's and plaintiff's affidavits will be treated similarly.

tion, the adverse employment action was the product of racial discrimination. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1418 (4th Cir.), *cert. denied*, 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991). The Fourth Circuit noted that in disciplinary discharge cases such as this one, the traditional *prima facie* model is not wholly applicable. *Moore*, 754 F.2d at 1105–1106. Instead, the most common method for plaintiff to use to establish a *prima facie* case is to show (1) that he is a member of a protected minority, (2) that he was disciplined, (3) that a person of another race engaged in similar conduct, and (4) that the disciplinary measures taken against plaintiff were harsher than those taken against the other person. *Id.* Establishing a *prima facie* case creates a presumption of discrimination, and the burden then rests with the defendant to articulate a legitimate explanation for the employment decision.

When a plaintiff's case is presented under the *McDonnell Douglas* proof scheme in response to a defendant's motion for summary judgment, the plaintiff must present admissible evidence to establish a *prima facie* case. If the defendant then advances a legitimate explanation, the plaintiff must present evidence, including that in support of his *prima facie* case, that satisfies the ultimate burden of persuasion. Although the proof scheme is staged with shifting burdens, such discrimination cases may nevertheless be evaluated under established summary judgment principles.

*Mitchell*, 12 F.3d at 1315. "Thus, the plaintiff can fail to meet his burden, not only by failing to establish a *prima facie* case, but also by failing to show a genuine factual dispute over the employer's legitimate nondiscriminatory explanation." *Id.* at 1317.

In a racial discrimination case, once the defendant has presented legitimate nondis-

criminatory reasons for its actions, the burden returns to the plaintiff to avoid summary judgment. The plaintiff must show the defendant's proffered reason was false or a mere pretext given to hide its true racial motivations. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 516, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). In order for plaintiff to prevent summary judgment from being entered against him, he must establish that "but for" racial discrimination she would not have been discharged. *See generally, Sailor v. Hubbell, Inc.*, 4 F.3d 323 (4th Cir.1993); *Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845 (4th Cir.1988). Defendant has moved for summary judgment claiming that plaintiff has neither presented sufficient evidence to establish a *prima facie* case under Title VII nor presented evidence to show that defendant's legitimate non-discriminatory reason for terminating plaintiff was a pretext. The Court finds that defendant is correct on both accounts.

■ Regarding the elements of his *prima facie* case, plaintiff has failed to show that employees of a race other than his engaged in similar conduct. He therefore cannot show that anyone of a different race was disciplined in a different fashion. In an attempt to prove his *prima facie* case, plaintiff has put forth several incidents which he says' involve similar conduct. The Court will address these in turn. In comparing them the Court will employ the test set out in *Moore* 754 F.2d at 1107. While exact equivalence is not required, the incidents must be comparably serious given the level of harm caused and the culpability of the offenders. *Id.* at 1107–1109.

Before examining plaintiff's evidence to decide whether he has produced any comparable incidents, it is first helpful to define exactly what plaintiff's conduct was. Defendant's Workplace Violence Policy

states that, "Violence and threats of violence in the workplace will not be tolerated." (Dep.Ex. 24) A threat is defined as an "[e]xpression of intent to inflict injury," while violence is defined as the "[u]se of physical force to injure or abuse." The policy states that violations of the policy are serious misconduct and that "[d]isciplinary action up to and including dismissal will be taken." (*Id.*) This policy became effective on August 22, 1996 and was, as far as is indicated in the record, still in effect at the time plaintiff was terminated. Plaintiff's actions on July 16, 1998, at least arguably, violate the portion of this policy forbidding the use of physical force to abuse another. (There is no direct indication that plaintiff intended to or actually did injure Phelps with his push.)[6] Cash and defendant predicated plaintiff's termination on the arguable violation of the policy. Keeping in mind that this was the offense for which plaintiff was terminated, the Court will now examine the allegedly comparable incidents proffered by plaintiff.

The first allegedly comparable incident pointed to by plaintiff is Phelps' actions during his argument with plaintiff on July 16, 1998. The incident is well documented, occurred during the time period relevant to this case, and, according to plaintiff, involves a violation of defendant's Workplace Violence Policy by a Caucasian

employee. However, as far as was revealed to defendant during the process leading up to plaintiff's termination and during the grievance proceedings following it, Phelps never touched plaintiff in anger. Despite making multiple oral and written statements to defendant concerning the incident, plaintiff made the claim that Phelps touched him with his chest for the first time in his deposition. This was also never mentioned in any of the statements given to defendant by witnesses to the incident and is not supported even by a witness affidavit presented by plaintiff in support of his brief opposing summary judgment. (*See generally,* Freeman Aff. (no touching by Phelps mentioned)) In the end, whether or not Phelps actually did touch plaintiff is irrelevant because plaintiff and others failed to inform defendant of this fact. As far as defendant knew, plaintiff touched Phelps in anger while Phelps made no contact with plaintiff. This was the information upon which the decision to terminate plaintiff and retain Phelps was made.

Based on the information known to defendant, it is obvious that Phelps and plaintiff's behaviors are not comparable. Phelps' behavior can be appropriately characterized as rude, childish, invasive, provocative, and even aggressive. However, it was not threatening within the meaning of defendant's Workplace Violence Pol-

---

**6.** Plaintiff has claimed at various times that his actions were taken in self-defense as a reaction to what he perceived as a threat from Phelps that Phelps might poke him in the eye with his finger. He has produced no credible evidence to support a reasonable belief in such a threat. Even taking plaintiff's version of events as true, Phelps never stated an intention to poke plaintiff in the eye or harm him in any way. Further, his finger had been in plaintiff's face long enough for plaintiff to warn him to remove it twice. Had he wanted to poke plaintiff, he certainly could have done so well prior to the push. Nothing about

Phelps' actions at the time of the push had changed to make plaintiff think that Phelps would poke him despite not having done so up to that point. Finally, even if Phelps' behavior could be considered a threat, plaintiff could have backed up and/or walked away prior to pushing Phelps just as he testified that he did following the push. Instead, plaintiff chose to react aggressively and escalate the argument by making physical contact. No finding of self-defense could be based on the current record absent a truly tortured definition of the term.

icy because he made no actual or implied statement of any intent to inflict injury on plaintiff.[7] Plaintiff's behavior did violate the policy because he used physical force against Phelps. Their conduct is not comparable for Title VII purposes.

The second incident advanced by plaintiff as comparable is the "blue light" incident in which Phelps and Shotwell allegedly pulled over a female motorist while test driving a police car. This incident varies in a number of respects from plaintiff's pushing of Phelps. First, any violation did not involve violence to others and, therefore, was different in kind from the Workplace Violence Policy. This makes it difficult, if not impossible, to compare the two incidents at all. Second, plaintiff's pushing incident unquestionably and admittedly involved an intentional act. The intentionality of Phelps' and Shotwell's actions are much more subject to question. Although an allegation was purportedly made by an unidentified woman that they activated a blue light and pulled her over, there is no proof of intention. Phelps claimed and continues to claim that any activation of the blue light was accidental, rather than intentional, and denies that he pulled anyone over. Phelps' denial of intentional wrongdoing and a lack of witnesses to the contrary, makes this incident very different from the incident involving plaintiff and Phelps. Because the blue light incident did not involve workplace violence and did not involve an unquestionably intentional act, it cannot serve as a "comparable incident."

Plaintiff next contends that a similar incident occurred when · Mary Sykes, a Caucasian female in Fleet Maintenance, used racist language while referring to an African American coworker and was not disciplined. This allegation is based on a statement to that effect in Ferguson's Affidavit. However, as with many statements in her affidavit, this statement is unsupported and unexplained. It is not clear what Sykes said or the extent to which the allegations were proven. Therefore, even if the Court were to assume that the breaking of a City policy against racism (which, incidentally, plaintiff has not produced) may be equivalent to violating its Workplace Violence Policy, plaintiff has supplied insufficient evidence to allow a trier of fact to compare the incidents and conclude that they are similar.

Plaintiff also claims that Phelps had twice previously grabbed him from behind, but was not disciplined. Once again, there are several distinguishing features between these alleged incidents and the one for which plaintiff was fired. First, there is again a disparity in proof. Although there is disagreement over irrelevant details, the essential facts of plaintiff intentionally pushing Phelps during an argument in order to get Phelps' finger out of his face are not in dispute. Phelps did not retaliate. This is not true of the incidents where Phelps supposedly grabbed plaintiff from behind. Phelps has actually denied that this occurred and has claimed that plaintiff grabbed him. In any event, plaintiff admits twisting around and putting Phelps in a choke hold after the second incident. (Wall Dep. at 151; Ayers Dep. at 16) There is no evidence that Phelps' act

---

7. Plaintiff has introduced the affidavit of Kay Ferguson which makes the bald statement that Phelps' conduct "was a violation of the Workplace Violence policy." (Ferguson Aff. at ¶ 14) However, Ferguson gives no basis for her opinion and does not explain this statement, which is contrary to evidence before the Court when considered in light of the plain language of the policy. It appears to be her own subjective and unsupported belief and cannot be considered as competent evidence to support plaintiff's claims.

of grabbing was in anger either time.[8] This does not excuse Phelps for having initiated the grabbing, especially after plaintiff allegedly expressed displeasure over the first grabbing incident. On the other hand, plaintiff's spinning around and putting Phelps in a choke hold was an angry response. Thus, there are important distinctions between the two incidents.[9]

A more important distinction of the grabbing incident lies in the fact that plaintiff has not presented evidence that Kent Cash, the person alleged to have made the racist decision to terminate plaintiff, was ever informed of Phelps' alleged grabbing of plaintiff. Plaintiff did tell his supervisor at the time, Tom Ayers, that Phelps had grabbed him and that he did not appreciate it. However, Ayers, who is African American, did not pursue the incident any further because it was his understanding that plaintiff did not wish to do so. Because Cash was never given the opportunity to act on this incident, it cannot be compared to the incident leading to plaintiff's termination.

Finally, plaintiff relies on another incident of horseplay as a "similar incident." Once again, horseplay in general is not similar to plaintiff's angry push of Phelps. (*See also* n. 8) Second, the specific incident is markedly different. According to George Bailey, who is African American, Ricky Beck grabbed him under his collar on several occasions. Bailey's feelings about this were generally negative and he asked Beck not to do it again. Still, he clearly understood that Beck was playing because Beck was laughing at the time he did it. (Bailey Dep. at 17) Bailey also spoke with Tom Ayers about the grabbing, but plaintiff cites to no evidence in the record which shows that Kent Cash was ever informed of the incidents or that Bailey sought to have Beck punished for the incidents. To the contrary. The record, in fact, shows that Bailey spoke with Ayers only after plaintiff reported the incident to Ayers without Bailey's permission and Ayers approached Bailey. Bailey told Ayers to "[f]orget about it." (Bailey Dep. at 27) Once again, plaintiff is citing to an incident that upper level management was never informed occurred. This, in addition to the other dissimilarities in the episodes, makes the incident irrelevant in a search for a situation similar to the one that led to plaintiff's dismissal.

Overall, plaintiff has named several occasions where he says that similarly situated Caucasian employees were treated more leniently than he was. However, he has either failed to prove that the incidents

---

**8.** The incident falls under the category of "horseplay." In fact, the only hint of anger appears to be plaintiff's putting Phelps in a headlock.

**9.** Plaintiff claims that defendant cannot distinguish this incident by labeling it "horseplay" because defendants' training materials say that termination is required for horseplay as well as threats. As support for this, he cites to training materials presented to the Court as Exhibit F attached to his brief. These materials have no evidentiary value. The least of their difficulties is that they are undated, meaning that plaintiff has not shown that they were in effect at the time he was terminated. They are also presented out of context. They consist of summary bullet points and are so full of generalities and jargon as to be useless without some sort of accompanying narrative presentation. Finally, they are not substitutes for actual official personnel policies, nor do they trump them. Just as the training materials suggest that horseplay requires termination, it also appears to state that threats and physical contact require termination. This is in clear contradiction to City policy which, as previously discussed allows, but does not require, termination for these offenses. Obviously, these materials, standing alone, are not a completely accurate reflection of City policy.

occurred, failed to prove that they are factually similar in nature, or has failed to show that they were ever brought to the attention of Kent Cash or other upper level managers who were involved in his termination. As such, plaintiff has failed to prove a vital part of his *prima facie* case. Coupled with the fact that he has produced no direct proof of racial discrimination, plaintiff's failure to establish a *prima facie* case means that defendant's motion for summary judgment should be granted and that his claim of racial discrimination should be dismissed.

■ As an alternative basis for its decision, the Court notes that even if it were to somehow determine that plaintiff did establish a *prima facie* case of racial discrimination, plaintiff's claim would still fail. This is because defendant has produced a nondiscriminatory reason for terminating plaintiff—his violation of the Workplace Violence Policy which allows for termination upon violation—and plaintiff has failed to produce evidence which would allow a finding that this reason is a mere pretext for discrimination.

Plaintiff does not deny that the reason given for his firing, if true, is a valid reason for dismissal. Instead, he argues that it is a pretext. Once again, he gives a laundry list of reasons why this is so.

Initially, plaintiff contends that there is credible evidence that he did not violate the Workplace Violence Policy because he used reasonable force to keep Phelps from poking him in the eye. This is not so.

There is no evidence that Phelps was going to poke plaintiff in the eye. He made no statement to that effect and had not done so despite ample opportunity prior to plaintiff's push. Even if the Court were to assume that Phelps did intend to poke plaintiff in the eye, plaintiff's use of force was still unreasonable. Plaintiff, both at the time he pushed Phelps and to this very day, has been entirely focused on Phelps removing his finger from plaintiff's face. What plaintiff has forgotten is that another option was available. The two men were arguing in an open space. At any time that he wished, plaintiff could have removed his face from Phelp's finger by backing up or walking away. In fact, he claims that he finally did this at the end of the argument. Although it is understandable that plaintiff would not have wanted to walk away in light of Phelps' insulting, childish behavior, plaintiff's "self defense" claim still fails because he chose not to walk away. No force was actually necessary to separate his face and Phelps' finger.[10]

Plaintiff's second and third arguments in favor of finding that the defendant's reason for firing him was a pretext are related and will be discussed together. Plaintiff contends that Cash decided to terminate plaintiff immediately upon hearing Phelps' version of events and that he did not conduct a full investigation as required by City policy. Overall, there is some merit to plaintiff's complaints of a hasty decision. Although the evidence is

---

**10.** At an earlier point in his brief, plaintiff mentions the testimony of Ayers who stated that he did not believe that the Workplace Violence Policy was violated if one employee stuck his finger two to three inches from the face of a second employee, the second employee asked him twice to remove it, he did not, and the second employee pushed the first employee in order to remove the finger. It is not entirely clear whether plaintiff relies on Ayer's testimony as part of the "credible evidence" that he did not violate the Workplace Violence Policy. To the extent that he does, the evidence does not help him. Ayers was not involved in the decision to terminate plaintiff and plaintiff has not shown that he is in a policy making position so that his opinion would in any way bind defendant regarding policy interpretation. Nor has Ayers explained why backing up was not an option.

less than clear due to the persons involved trying to remember the time of day that they engaged in certain acts which occurred three years in the past, it is relatively clear that a decision to recommend termination was made quickly by Cash, with some lesser level of participation by Fletcher and Harris. Also, this decision was made with only the benefit of the initial statements from Phelps and Beasley and appears not to be in accord with City policy regarding complete investigations. Still, viewed in light of the history of the Fleet Maintenance Department, this does not support a finding of pretext. The supervisors in the Department have a history of making decisions based on short and/or incomplete investigations. For instance, Cash's incomplete investigation of the blue light incident, Ayers' failure to pursue the Ricky Beck/George Bailey collar grabbing incidents, Ayers' failure to pursue Phelps' grabbing of plaintiff, and Ricky Beck's failure to fully investigate Samuel Brown's complaints about the seat plaintiff was using before suspending plaintiff, all illustrate the point. This appears to be true no matter the race or position of the employees or supervisors involved. Whatever the official City policy regarding documentation and investigation, it has long been the consistent practice of Fleet Maintenance to investigate only so far as needed to reach what the supervisor feels is an appropriate decision and no further. As discussed previously, these decisions show no pattern of racial discrimination. The fact that a half-hearted investigation and quick decision occurred in plaintiff's case, while perhaps unfortunate, does not show racial animus.

Moreover, any harm caused by the lack of investigation in plaintiff's case was rectified by (1) Human Resources' insistence that the supervisors get a statement from plaintiff before proceeding with the dismissal; (2) defendant's exhaustive formal and informal grievance process; and (3) plaintiff's utter failure to produce any evidence that a more thorough investigation would have changed the outcome. All of the evidence submitted to this Court shows that plaintiff did violate the Workplace Violence Policy and that termination was an allowable and standard sanction for the type of violation that occurred. Moreover, at the time, the City Manager had instilled a heightened awareness and sensitivity to workplace violence. (Bell Affidavit) Cash, Fletcher, and Harris acted in accordance with the policy. (Cash Dep. 71–83) The three came to a preliminary decision to terminate plaintiff. Fletcher and Harris deferred to Cash's understanding that the new City Manager did not tolerate workplace violence.[11] (Fletcher Dep. at 18) Fletcher and Harris then collected statements and processed the matter. Eventually, the matter was reviewed at a grievance hearing where plaintiff was able to present all of his evidence.

Plaintiff's next claim allegedly supporting a finding of pretext is "Cash's mendacity" during his deposition. Specifically, plaintiff claims that Cash's statements that he did not learn of the "blue light" incident until plaintiff brought it up, that he told Fletcher and Harris to investigate the incident for which plaintiff was fired, and that the decision to terminate plaintiff was a consensus between himself, Harris, and Fletcher are all false.

Regarding the "blue light" incident, certainly there are clear indications that Cash did know something of the incident prior to plaintiff raising it during a grievance

11. Harris states he gets too close to people and would rather have people work out problems rather than fire them. (Harris Dep. 26, 31). He says that in light of the no violence policy, he would have made a "bad decision" and not fired plaintiff. *Id.*

hearing. He has admitted this in his deposition in this case, although he made contrary statements in a memo to the EEOC in 1999. (Cash Dep. at 47–48, Plaintiff's Brf. at Ex. B) Exactly what Cash knew and when is fairly unclear, however, and this is not surprising considering that the "blue light" incident occurred almost five years prior to the EEOC memo and seven years before Cash's deposition in this case. There is no question that Cash's recollection of the incident and of other events from that time frame are somewhat hazy and do not completely mesh with statements other witnesses have made. Even assuming a jury could find that Cash made incorrect or untrue statements in his deposition, it could just as easily find that he was simply mistaken due to the passage of time. This fails to provide plaintiff with any evidence of pretext, or any evidence that the true motive for plaintiff's termination was his race.

As for plaintiff's contention that Cash falsely claimed that he ordered an investigation, plaintiff has produced no evidence that Cash made such a statement. Plaintiff does not cite to any testimony given by Cash to that effect. As plaintiff's own brief notes at page 13, the claim that Cash ordered an investigation is made by defendant in its brief on pages 7 and 8 and is not supported by the record, including Cash's deposition. Plaintiff cannot use defendant's misstatement to impeach Cash's credibility.

Finally, plaintiff contends that Cash's portrayal of the decision to terminate plaintiff as a consensus between himself Fletcher and Harris is "false." Once again, the alleged falsity of Cash's claim is, at best, only partially supported by the record and is as easily attributable to effect of the passage of time on the memories of the witnesses as to falsity. Cash did state, in his deposition, that he met with Fletcher and Harris prior to terminating plaintiff, and that he asked if there was a consensus as to the decision, and that there appeared to be. (Cash Dep. at 76–77) Fletcher testified that the three met, that Cash stated that the Workplace Violence Policy as enforced by Ewell required termination, that he went along with this, and that Harris may have voiced some disagreement at some point. (Fletcher Dep. at 19–21) Harris has no recollection of any meeting. (Harris Dep. at 24) Presented with this evidence a jury could find that Cash lied, that Fletcher lied, that Harris lied, or that they were all truthful to the best of their ability to remember, which has been severely eroded over time. Once again, viewing every possible reasonable inference in plaintiff's favor, the differing testimony provides him with extremely weak, if any, evidence that Cash may have falsified some details of his deposition testimony. It again provides no evidence race played any part in his firing.

Plaintiff's fifth allegation made to support his pretext argument is that Cash failed to fire Freeman for slapping a coworker in the face even though Cash "claims that any physical contact in the workplace requires termination." (Plaintiff's Brf. at 16) This statement is incorrect because neither Cash nor defendant claim that all touching requires termination. Instead, they plainly state that touching *in anger* results in termination as the City policy has been applied. (Cash Dep. at 96, Defendant Brf. at 7, 17) This distinguishes the incident involving Freeman. Moreover, Freeman is African American and, therefore, this incident actually erodes plaintiff's entire case of disparate treatment and pretext based on race. It shows that anger, not race, is the key factor in the application of its Workplace Violence Policy.

Plaintiff's sixth proffer of pretext asserts that defendant's claim that termination is required when employees make contact in anger is false. (In this argument, plaintiff acknowledges the importance of touching in anger.) Plaintiff asserts that two workers in the Property Care department got into a fight and were not fired. The only evidence that plaintiff has produced concerning this incident is Ferguson's affidavit. (Ferguson Aff. at ¶ 16) That evidence is sorely lacking and insufficient. As with many of her other statements, Ferguson provides no support or explanation for her allegation of a fight between two Property Care department employees and does not state her basis for such knowledge. This alone might well render the evidence inadmissible. Even if otherwise admissible, the evidence is clearly inadmissible on relevance grounds because the conclusory nature of the statement makes it worthless in establishing pretext. The statement gives the Court (and a jury) no clue as to whether the employees were in a verbal or physical fight, whether the fight occurred during Ewell's tenure as City Manager, whether the fight occurred before or after the Workplace Violence Policy was implemented, whether the fight occurred prior to plaintiff's termination, or whether Cash and other alleged decision makers knew of the fight prior to terminating plaintiff. Therefore, it is useless in deciding whether the key decision makers in plaintiff's termination have lied about the consistency of their rule that touching in anger equals termination.

Plaintiff's seventh contention is similar to his sixth. He contends that defendant's failure to fire Mary Sykes for making racist comments demonstrates that the defendant lied in claiming that people had to be fired for violating zero tolerance policies. Again, this involves an apparent misstatement of defendant's policies. The only actual policy cited to by the parties in this case, the Workplace Violence Policy, states that zero tolerance means *discipline* for violations, not automatic termination. (Dep. Ex. at 24) The Court is not aware that defendant has made contrary arguments and plaintiff does not cite to evidence that it has. Second, for reasons discussed previously, plaintiff's only evidence that the Sykes incident occurred comes in the form of conclusory statements made in Ferguson's affidavit and is, therefore, without value.

Plaintiff's eighth pretext argument is that a second, longer, typed statement by Tina Beasley and an undated statement by Ike Johnson were created "after the fact" in order to justify defendant's decision to terminate plaintiff. It is unclear after what fact the statements were allegedly created. If plaintiff means after his termination, Cash made it clear in his deposition that only an initial written statement from Beasley existed at the time of the decision to terminate plaintiff. He made no claim that Johnson's statement existed at that time. Therefore, the timing of the creation of the statements in no way shows that Cash or anyone else acted with any secret racial motive at the time plaintiff was terminated. The statements simply are not relevant to the issues at hand.

Plaintiff's last piece of potential evidence cited in support of his belief that he was fired on a pretext is Kay Ferguson's conclusion that he was fired because of his race. She reached this conclusion while investigating plaintiff's grievance that he filed following his termination. Plaintiff has failed to explain why Ferguson's personal opinion regarding the ultimate issues in litigation such as this should be given weight. However, even assuming that it might be in theory, it should not be in the present case because Ferguson's affidavit makes it clear that she bases her conclusion on some of the very same arguments

that plaintiff has raised up to this point. That Ferguson shares plaintiff's belief in the correctness of his rejected arguments does not advance his case.

Looking at the pretext issue as a whole, plaintiff, while giving very little in the way of argument or citation to the record, has advanced a laundry list of proposed reasons to find that defendant's proffered reason for his termination was a pretext. However, when these reasons are reviewed closely, the only ground gained by plaintiff is that he has weakly called Cash's general credibility into question. His other arguments add up to nothing and a weak attack on Cash's credibility is too slim a reed to support his entire case. There is also significant evidence cutting against plaintiff, such as the fact that Cash is of mixed race himself, the fact that Cash actually works as a diversity trainer with the City, the fact that Cash's god-mother with whom he has a close relationship is African American, the fact that a disappointed white employee filed an EEOC complaint against Cash, the fact (according to plaintiff) that Freeman, a black employee may have slapped someone and yet was not fired, and the fact that Cash signed off on positive evaluations given to plaintiff for a number of years. (Cash Dep. at 169, 126, 142, Plaintiff Aff., Ex. A) Given the state of the evidence, no jury could reasonably find that defendant's proffered reason for his termination is a mere pretext for racial discrimination. For this additional reason, defendant's summary judgment claim is granted as to plaintiff's claim of disparate treatment due to race.

### Retaliation

 Title VII makes it illegal to discriminate against an employee because that person opposes any employment practice made illegal under Title VII. 42 U.S.C. § 2000e–3(a). Plaintiff's second claim for relief alleges that he was fired in retalia-

tion for his previous complaints that Kent Cash had engaged in illegal racial discrimination. Just as the *McDonnell Douglas* burden shifting scheme applied to plaintiff's disparate treatment claim, it applies to this as well. *Karpel v. Inova Health System Services,* 134 F.3d 1222, 1228 (4th Cir.1998). To establish a *prima facie* case of retaliation, plaintiff must show that (1) he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the activity and the adverse action. *Beall v. Abbott Laboratories,* 130 F.3d 614, 619 (4th Cir.1997). If the *prima facie* case is established, the burden then shifts to the defendant to give a legitimate reason other than retaliation for taking the adverse action. If defendant does so, plaintiff must show that this reason is false and that retaliation was the real motivation for the adverse action. In appropriate circumstances, a *prima facie* case along with evidence that the proffered legitimate reason was false may alone be enough to allow a trier of fact to conclude that the employer violated the law. *Equal Employment Opportunity Commission v. Sears Roebuck and Co.,* 243 F.3d 846, 852 (4th Cir.2001).

Defendant has not contested the first two elements of plaintiff's *prima facie* case, and the Court agrees that plaintiff has submitted sufficient evidence to establish them. Plaintiff did complain of racial discrimination when he signed the petition with the thirteen other employees in 1994. He also made allegations of disparate treatment regarding the "blue light" incident in 1994. As for adverse employment actions, plaintiff was terminated in July of 1998. Therefore, the only contested element is whether there is a causal relationship between plaintiff's complaints in 1994 and his firing in 1998.

As an initial matter, plaintiff faces a steep challenge in proving a causal connection. Temporal proximity is a common and important means of proving a causal connection in retaliation cases and, as plaintiff admits, three years and five months passed between the time plaintiff's grievances were concluded and the time that plaintiff was dismissed. At least one court has found that a two to three year gap is too long to allow a plaintiff to establish causation. *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir.1998). The Fourth Circuit has stated that even a thirteen month gap is too long absent other evidence of retaliation. *Causey v. Balog,* 162 F.3d 795, 803 (4th Cir.1998). Plaintiff argues that these cases do not bar him *per se* from proving his case due to the passage of time. He may well be right on this point, the statement in *Sweeney* was at best an alternate holding and was perhaps *dicta,* and *Causey* left open the possibility that the plaintiff in that case could still prevail by producing more evidence. However, these cases do demonstrate that the large gap between plaintiff's protected activity and his termination cuts strongly against him and increases the burden on him to present proof of retaliation.

In attempting to produce proof of retaliation, plaintiff once again has resorted to a conclusory laundry list of items to substantiate his case. Most were raised and rejected previously during his disparate treatment claim. They fail now for the same reasons. Specifically, plaintiff claims that Cash terminated him quickly without adequate investigation and asked Human Resources why he had to get both sides of the story. This is consistent with other poor investigations in the Fleet Maintenance department. Plaintiff states that Phelps, Shotwell, Beck, and Freeman were not terminated for comparable misconduct. Their conduct was not comparable. Plaintiff alleges that Cash lied. His support for this is weak to non-existent and cannot sustain his claim in light of the large time gap. Finally, plaintiff again turns to Ferguson's conclusion that he was discharged due to retaliation. Her conclusory arguments fail for the same reasons his do.

In addition to his previously raised arguments, plaintiff also raises two slightly new ones. Plaintiff contends that Cash's "threatening" statement that plaintiff would want his co-workers to get a car off him if one fell and his statement that he didn't like seeing his name in the paper prove retaliatory animus. At most, the statement concerning the car falling on plaintiff is ambiguous, rather than threatening. Cash certainly did not threaten to cause a car to fall on plaintiff or cause him any other harm, including firing him from his job. The statement is really a blunt way of reminding plaintiff that in an employment situation, one needs to get along with one's co-employees, and that co-workers, like Phelps and Shotwell, might resent plaintiff for tattling on them in the newspapers. It was a way to encourage plaintiff to rethink how he dealt with co-workers in the future. As for the statement that Cash did not like seeing his name in the paper connected to charges of racial discrimination, the statement is nothing more than a truism. Charges such as those made by plaintiff are very serious charges in today's society and no one would enjoy having them publicly leveled against them. The statement in no way implies that Cash would take action against plaintiff almost four years later.[12]

12. During the same year plaintiff was fired, Cash promoted a black person over Ricky Beck, who filed an EEOC charge. (Cash Dep. at 136) Beck now does not talk to Cash. (*Id.* at 137) From Cash's point of view, every decision he makes can be vilified and he would

Plaintiff also raises one other new argument. He states that 46% of the employees who signed the 1994 petition have since been terminated or involuntarily transferred, while only 20% of the employees who did not sign the petition have been terminated or transferred. In presenting this evidence, plaintiff has simply quoted the numbers and asked the Court to draw an inference of discrimination based on the numbers. He has not discussed the circumstances behind the terminations or transfers of any of the other employees or the level of Cash's involvement in those terminations or transfers. Of particular concern is the small number of total people involved and the fact that the numbers presented are not so overwhelming that a conclusion of retaliation is compelled. For example, the evidence does not show that all 13 of the petition signers were fired versus none of the non-signers. The actual numbers are that of the thirteen employees who signed the petition and who have been identified by the parties, three still work in Fleet Maintenance, four have been terminated, two were transferred due to budget cuts, and four retired or quit voluntarily. Of the twenty identified Fleet Maintenance employees who did not sign the petition, eight are still employed in Fleet Maintenance, four were terminated, one transferred voluntarily to another department, and seven retired or quit voluntarily. In both groups, there is a high turnover rate overall and no majority subgroup. The numbers are simply not disparate enough to allow a fact finder to reach a conclusion that the petition signers, including plaintiff, have been retaliated against.

In the end, plaintiff has failed to show there is sufficient evidence to show a causal connection between his engaging in protected activity and his firing three to four years later. He has also failed to present any evidence beyond innuendo showing that defendant's proffered reason for his termination, his violation of the Workplace Violence Policy, was a pretext for retaliation. Also, significant evidence to the contrary exists in the form of the evaluations from 1994 through 1998 rating plaintiff as "outstanding ." Cash was one of the persons signing these evaluations and approving pay increases for plaintiff. Plaintiff can only offer mere speculation that Cash did these positive things, and then suddenly retaliated in 1998. Instead, the fact that the termination came only after a very public incident involving violation of the Workplace Violence Policy, which had recently been emphasized by the new City Manager, negates any lingering circumstantial suspicion of retaliation. Plaintiff's retaliation claim fails and defendant's motion for summary judgment on that claim fails.

## Municipal Liability

Plaintiff's final claim is raised under 42 U.S.C. § 1981 and seeks to hold defendant liable for race discrimination. That claim is judged using the same standards as plaintiff's Title VII claims. *Gairola v. Commonwealth of Virginia Department of General Services*, 753 F.2d 1281, 1285 (4th Cir.1985). Therefore, his § 1981 claim fails for the same reasons as those claims and is dismissed.

**IT IS THEREFORE ORDERED** that plaintiff's motion to strike (docket no. 31) be, and the same hereby is, denied.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment

not want to see all of them in the paper associated with ugly charges of discrimination.

(docket no. 20) be, and the same hereby is, granted and that this action is dismissed.