UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 15-1839

_____

CIMENGA M. TSHIBAKA, M.D.,

        Plaintiff - Appellant,

    v.

JOHN SERNULKA, individually and in his official capacity as
CEO of Carroll Hospital Center, Inc.; CARROLL HOSPITAL
CENTER, INC.; JAIME ELLIOTT, individually,

        Defendants - Appellees,

    and

BOARD OF DIRECTORS OF CARROLL HOSPITAL CENTER, INC.,

        Defendant.

_____

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  J. Frederick Motz, Senior District
Judge.  (1:13-cv-02760-JFM)

_____

Argued: September 20, 2016       Decided: December 13, 2016

_____

Before GREGORY, Chief Judge, and KING and AGEE, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded by unpublished
per curiam opinion.

_____

**ARGUED:**    Conrad W. Varner, VARNER & GOUNDRY, Frederick,
Maryland, for Appellant.  Robin Locke Nagele, POST & SCHELL,
P.C., Philadelphia, Pennsylvania, for Appellees.  **ON BRIEF:**

Sheila A. Haren, Elizabeth M. Hein, POST & SCHELL, P.C., Philadelphia, Pennsylvania, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Cimenga M. Tshibaka, a Maryland physician, appeals from the district court's rulings that dispensed with a civil suit concerning the termination of his hospital privileges. Tshibaka, who had privileges at Carroll Hospital Center, Inc. ("CHC"), in Westminster, Maryland, was accused of sexual harassment by a patient care technician. After CHC terminated Tshibaka's privileges, he initiated litigation in state court against the patient care technician, CHC, and its CEO. The complaint alleged a race discrimination claim under 42 U.S.C. § 1981, plus various state law claims. The defendants removed the matter to the District of Maryland, where the court dismissed the patient care technician and awarded summary judgment to CHC and its CEO. Tshibaka has appealed, and as explained below, we affirm in part, vacate in part, and remand.

I.

A.

1.

Dr. Tshibaka, who is African-American, is a native of the Democratic Republic of the Congo and a naturalized citizen of

3

the United States.[1]

Tshibaka thereafter completed a residency in cardiothoracic surgery at the University of Illinois.

In 2005, Tshibaka sought to join the medical staff at CHC. During the credentialing process,



On April 11, 2006, CHC granted Tshibaka unrestricted hospital privileges.

Tshibaka's tenure at CHC proceeded without incident until October 2008,

---

[1] Because we are assessing a summary judgment award, we recount the facts in the light most favorable to Tshibaka. See Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).



On March 15, 2010, Sernulka and Tshibaka executed an Early Resolution Agreement. Pursuant thereto, Tshibaka agreed to apologize to the nurse, undergo a mental health evaluation, and begin treatment. The Early Resolution Agreement also contained a last chance provision:



---

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[REDACTED]

See J.A. 468. By the Early Resolution Agreement, Tshibaka waived certain of his rights under CHC's Medical Staff Bylaws (the "M.S. Bylaws").

Shortly thereafter, pursuant to the Early Resolution Agreement, CHC hired two experts — clinical sexologists Kate Thomas and Chris Kraft — to evaluate Tshibaka. The expert report concluded that Tshibaka was a safe medical practitioner who posed no danger to the staff or patients at CHC. The report found that, although Tshibaka did not have a sexual disorder, his interpersonal skills were occasionally deficient. It recommended that Tshibaka undergo monthly individual psychotherapy sessions. By mutual agreement, those sessions were conducted by Thomas. On March 28, 2011, Thomas advised CHC that she was discharging Tshibaka as her patient because he had completed the recommended therapy.

On June 24, 2013, defendant Jaime Elliott was working as a patient care technician in CHC's Wound Care Center. Tshibaka routinely worked at the Wound Care Center on Monday afternoons and often interacted with Elliott. [REDACTED]

[REDACTED]

6



For his part, Tshibaka maintains that Elliott fabricated each of the foregoing instances of █████████████████

2.

On June 25, 2013, Elliott lodged an internal sexual harassment complaint. CHC's Vice President of Human Resources, Tracey Ellison, and Chief Compliance Officer, Joyce Romans, promptly investigated Elliott's complaint pursuant to the hospital's Medical Staff Conduct Policy (the "M.S. Conduct Policy"). In their investigation, they interviewed Elliott, her supervisors, and her co-workers. Romans and Ellison shared the evidence with CEO Sernulka, who found Elliott's complaint to be credible. Sernulka thus concluded that Tshibaka had violated the last chance provision of the Early Resolution Agreement. Later that day, Sernulka decided to terminate Tshibaka's hospital privileges at CHC. To that end, he issued a

Determination of Probable Cause, which precipitated two interrelated processes: (1) a summary suspension process; and (2) a merits hearing.[3]

a.

Pursuant to the M.S. Bylaws, a summary suspension of a CHC staff member is warranted when "the conduct or condition of the Member presents an immediate threat of danger to any patient, other practitioner, Hospital personnel or visitor." See M.S. Bylaws § 10.2.1.2.[4] Conduct meriting a summary suspension includes sexual harassment, which is defined in the M.S. Bylaws as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" when "[s]uch conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." Id. §§ 10.3.1, 10.3.1.3. The summary suspension process begins when the CEO determines, in relevant part, that there is probable

---

[3] ████████████████████████████████████

████████████████████████████████████

████████████ ████████

[4] Our citations to the M.S. Bylaws refer to the Thirty-Fourth Revision thereof, effective June 2013, which is the version used by CHC during Tshibaka's suspension and merits hearing. See J.A. 86-136.

8

cause to believe that sexual harassment occurred. Id. § 10.3.2.1.

First, the CEO is empowered to impose a summary suspension. See M.S. Bylaws § 10.3.2.1.1. If a summary suspension is imposed, CHC's Medical Executive Committee (the "MEC") is obliged to review the suspension within four days and recommend that it be continued, modified, or terminated. Id. § 10.2.3.1. The MEC notifies the suspended physician of its decision and his right to review by the Board of Directors (the "Board"). Id. § 10.2.3.2.1. Finally, the suspended physician may submit a written request for Board review within seven business days of notification. Id. § 10.2.3.2.2. If requested, the Board reviews the MEC's decision and decides whether it is justified. Id. § 10.2.3.5.

In this situation, CEO Sernulka issued the Determination of Probable Cause on June 25, 2013, relating therein that Tshibaka had sexually harassed Elliott and violated the Early Resolution Agreement. Sernulka also decided to summarily suspend Tshibaka and promptly advised him of that decision. According to Tshibaka, Sernulka stated that he was "not interested" in hearing Tshibaka's side of the story and warned Tshibaka to get a good attorney because he would never practice medicine again. See J.A. 672.

9

On June 26, Sernulka notified the Medical Staff President (the "M.S. President") of Tshibaka's summary suspension. Sernulka advised Tshibaka that the MEC would review his suspension within four days and that he would be promptly informed of the MEC's decision. On June 27, the MEC voted to continue Tshibaka's summary suspension. Sernulka notified Tshibaka the following day of the MEC's decision and his right to appeal to the Board.[5] Tshibaka requested Board review, and on July 2, the Board voted to continue his summary suspension.

b.

Simultaneous with the summary suspension process, CEO Sernulka also pursued the second process — a merits hearing — seeking to terminate Tshibaka's hospital privileges. To obtain a merits hearing, the CEO of CHC issues a probable cause determination and provides written notice to the accused physician, the M.S. President, and the Board. See M.S. Bylaws § 10.3.2. Within three days of receiving the CEO's written notice, the M.S. President must appoint a three-member hearing panel, designate a panelist as chairman, schedule the hearing, and notify the accused physician of the hearing date. Id. § 10.3.3.

_____

[5] Sernulka was carrying a weapon when he hand-delivered the MEC's decision to Tshibaka, who said that Sernulka exposed the weapon in an effort to intimidate.

10

After conducting the merits hearing, the hearing panel issues a written decision, which includes findings of fact and recommendations with respect to disposition of the complaint and disciplinary action. See M.S. Bylaws § 10.3.4. During the evidentiary portion of the merits hearing, the panel cannot consider any prior-adjudicated incidents of sexual harassment. Id. § 10.3.4. The panel is entitled to consider such incidents, however, in determining the appropriate disciplinary action. Id. Following issuance of its written decision, the hearing panel provides the accused physician, the M.S. President, the CEO, and the Board with the decision and the record. Id.

Either party is entitled to pursue an appeal to the Board within five days. See M.S. Bylaws § 10.3.5. The Board hears oral argument within seven days — ensuring that each party has five days' advance notice — and accepts written arguments either before or at oral argument. Id. The parties' contentions on appeal must be based on the record made at the merits hearing and on the hearing panel's decision and recommendation. Id. Moreover, the Board cannot accept or consider any evidence that was not before the hearing panel. Id. Within five days of oral argument, the Board issues its final written decision on the merits. Id.

On June 26, 2013, Sernulka notified the M.S. President that Tshibaka was entitled to a merits hearing and asked him to

11

appoint a hearing panel. On June 27, Sernulka advised Tshibaka that he was seeking termination of Tshibaka's hospital privileges. Sernulka informed Tshibaka of his rights under the M.S. Bylaws, and Tshibaka requested a merits hearing. On June 28, the M.S. President advised Tshibaka that he had appointed the hearing panel, and that the hearing would be held on July 9. The panel delegated its responsibility for objections and other "lawyerly interactions" to the Medical Staff Attorney, Gertrude Bartel.

Pursuant to M.S. Bylaws § 10.3.4, the hearing panel decided to bifurcate its proceedings to consider the allegations of sexual harassment separately from the issue of disciplinary action. On July 9, the panel heard and evaluated the evidence concerning Elliott's accusations of sexual harassment; as per the Bylaws, it excluded all evidence of prior sexual harassment allegations against Tshibaka. The panel concluded that CHC had proven by a preponderance thereof that Tshibaka had engaged in sexual harassment ███████████████████████ On the other hand, the panel ruled that CHC had not proven the incident involving the allegation that Tshibaka █████████████ ███████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

12

[REDACTED]

J.A. 230.

Six days later, on July 15, the hearing panel reconvened to decide the appropriate disciplinary action. The panel again excluded from consideration all prior sexual harassment allegations against Tshibaka, ruling that they did not constitute prior-adjudicated incidents under the M.S. Bylaws. The panel concluded that a termination of Tshibaka's hospital privileges was neither mandated by the Early Resolution Agreement nor warranted. Instead, the panel agreed that Tshibaka should be suspended until a psychiatrist determined whether he was fit for duty. Both Tshibaka and CHC appealed the panel's decision.

On July 26, the Board conducted an oral argument session. Both CHC and Tshibaka had made written pre-argument submissions. CHC urged the Board to determine that Tshibaka had sexually harassed Elliott twice on June 24, and to terminate his hospital privileges. For his part, Tshibaka contended that CHC had conducted a biased investigation, that the hearing panel's conclusions were illogical and contradictory, and that Sernulka and Bartel had violated his due process rights. Tshibaka requested an immediate reinstatement.

13

After concluding the oral argument session, the Board deliberated and decided that Tshibaka had twice engaged in sexual harassment, ████████████████████████████ ████████████████████ The Board found Elliott to be credible and declined to find Tshibaka credible. The Board thus terminated Tshibaka's privileges to practice medicine at CHC.

B.

On August 9, 2013, Tshibaka filed this action against CHC, Sernulka, and Elliott in the Circuit Court for Baltimore City, Maryland. His state law claims included breach of contract, defamation, tortious interference with prospective advantage, and false light invasion of privacy. He also made a claim of race discrimination under 42 U.S.C. § 1981.[6] The defendants removed the matter to the District of Maryland on September 19, 2013. The district court possessed federal question jurisdiction over Tshibaka's § 1981 claim and supplemental jurisdiction with respect to his state law claims. See 28 U.S.C. §§ 1331, 1367(a).

Tshibaka filed an amended complaint in federal court on October 1, 2013, which Elliott promptly moved to dismiss for failure to state a claim. On November 14, 2013, the district

---

[6] Tshibaka initially alleged national origin discrimination as part of his § 1981 claim, but has since abandoned that theory.

court dismissed the complaint as to Elliott, concluding that, as a nonsupervisory co-worker who was not involved in the decision to terminate Tshibaka's hospital privileges, Elliott cannot be liable under § 1981. See Tshibaka v. Sernulka, No. 1:13-cv-02670 (D. Md. Nov. 14, 2013), ECF No. 20-21. The court also ruled that Elliott is entitled to immunity under Maryland law with respect to the only state law claim — defamation — lodged against her.

More than a year later, following the completion of discovery, CHC and Sernulka (together, "the CHC defendants") moved for summary judgment, and Tshibaka filed his own summary judgment motion. On June 30, 2015, the district court denied Tshibaka's request for summary judgment and awarded summary judgment to the CHC defendants. See Tshibaka v. Sernulka, No. 1:13-cv-02760 (D. Md. June 30, 2015), ECF No. 89-90. The court ruled that the § 1981 claim failed because Tshibaka had not made a prima facie showing that the CHC defendants terminated his hospital privileges on the basis of racial animus. The court also determined that the state law contract and tort claims failed because the CHC defendants are entitled to immunity under federal law, i.e., the Health Care Quality Improvement Act ("HCQIA"), see 42 U.S.C. § 11111(a). Tshibaka has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

15

## II.

We review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the nonmoving party. See Boyer-Liberto v. Fontainbleau Corp., 786 F.3d 264, 276 (4th Cir. 2015) (en banc). Summary judgment is inappropriate unless the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a).

We also review de novo a district court's dismissal of a complaint, accepting as true all factual allegations therein and drawing all reasonable inferences in favor of the non-moving party. See Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002). In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must allege sufficient facts to state a facially plausible claim. See Fed. R. Civ. P. 12(b)(6); E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## III.

On appeal, Tshibaka contends that the district court erred in awarding summary judgment to the CHC defendants on his claim under 42 U.S.C. § 1981, and in dismissing that claim as to Elliott. He also maintains that the court erroneously

16

determined that HCQIA immunity bars liability of the CHC defendants on his state law claims, and that the court further erred in ruling that state law immunity bars Elliott's liability on his defamation claim.

A.

We first assess Tshibaka's § 1981 claim against the CHC defendants and Elliott. Section 1981 prohibits racial discrimination in public and private contracts. See Guessous v. Fairview Prop. Inv., LLC, 828 F.3d 208, 225 n.6 (4th Cir. 2016) (citing Runyon v. McCrary, 427 U.S. 160, 168-69 (1976)). The statute provides, in pertinent part, that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens.

42 U.S.C. § 1981(a). The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).

1.

Tshibaka maintains that the district court erred in awarding summary judgment to the CHC defendants on his § 1981 claim for failure to establish a prima facie case, as required under the framework set forth by the Supreme Court in McDonnell

17

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). According to Tshibaka, he proved not only a prima facie case of race discrimination against the CHC defendants, but also that their explanation for terminating his hospital privileges is a mere pretext. On the other hand, the CHC defendants contend that Tshibaka failed to forecast sufficient evidence to prevail at any stage of the McDonnell Douglas analysis. Our review of the record convinces us that Tshibaka failed to make the necessary prima facie showing.

a.

It is settled that the McDonnell Douglas framework applies to a § 1981 claim. See Guessous, 828 F.3d at 216. An employee is entitled to prove discrimination under McDonnell Douglas's framework by establishing a prima facie case and demonstrating that the employer's proffered nondiscriminatory reason for taking an adverse employment action is pretextual. See Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

In the employee discipline context, a prima facie case consists of the following factors:

(1) The employee is a member of the protected class;

(2) The employer took an adverse employment action against the employee; and

(3) The employee engaged in prohibited conduct similar to that of a person outside the protected class and was subject to more severe disciplinary

18

measures than those enforced against the other person.

See, e.g., Moore v. City of Charlotte, N.C., 754 F.2d 1100, 1105-06 (4th Cir. 1985) (applying McDonnell Douglas to Title VII discriminatory discipline claim); see also Gairola v. Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985) (recognizing that elements of prima facie Title VII claim and prima facie § 1981 claim are identical).

If the employee makes a prima facie showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. See Holland, 487 F.3d at 214. The employer's burden is one of production, not persuasion. Id. After the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts to the employee to prove, by a preponderance of the evidence, that the employer's proffered reason for the action is merely a pretext for discrimination. Id. The employee can establish pretext by "showing that the employer's proffered explanation is unworthy of credence." Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

b.

The CHC defendants do not dispute that Tshibaka satisfies the first two prongs of the prima facie test. As an African-

19

American, he is within the class protected by § 1981.  See Holland, 487 F.3d at 210, 214.  CHC terminated his hospital privileges, which certainly qualifies as an adverse employment action.  See Moore, 754 F.2d at 1105-06.[7]  It is on the final prong of the applicable inquiry that Tshibaka falters.  He asserts that CHC had already permitted similarly situated Caucasian physicians to remain on the medical staff after they engaged in similar — or worse — conduct than Tshibaka allegedly perpetrated.  The Caucasian physicians Tshibaka presents as comparators, however, are not similarly situated for purposes of § 1981, thereby dooming his claim.

It is axiomatic that "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful."  Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008).  That showing normally includes evidence "that the two employees dealt with the same supervisor, were subject to the same standards,

---

[7] The parties quibble somewhat over whether Tshibaka was qualified for his position at CHC, which would be a factor under the traditional prima facie test.  See Holland, 487 F.3d at 214 (relating that, under traditional prima facie test, plaintiff must show:  (1) membership in protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated individuals outside of protected class).  Here, however, we need not decide whether Tshibaka was qualified for his position.  See Moore, 754 F.2d at 1005-06.

and had engaged in similar conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617–18 (7th Cir. 2000) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)), overruled on other grounds by Ortiz v. Werner Enters., No. 15-2574, slip op. at 5 (7th Cir. Aug. 19, 2016). As we have recognized, "[t]he most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed." Moore, 754 F.2d at 1105.

Three of the comparator physicians identified by Tshibaka — ████████, ████████, and ██████ — had allegedly sexually harassed female employees of CHC. Senior Vice President and Chief Medical Officer Smothers met with those physicians and warned them to refrain from further harassment, much as Smothers had admonished Tshibaka after the first complaint at CHC surfaced against him in 2008. Unlike Tshibaka, those physicians heeded Smothers's warnings; CHC is unaware of any subsequent allegations of sexual harassment against them. In other words, CHC did not treat those physicians more leniently than Tshibaka because they did not engage in any misconduct after receiving the first warnings. See Radue, 219 F.3d at 617–18 (observing that appropriate comparator must

21

engage in similar conduct without differentiating or mitigating factors that would distinguish employer's treatment).

A fourth physician, ████████, allegedly ████████ ████████████████████████████████ prior to working at CHC. Because █████ alleged misconduct occurred before his tenure at CHC — and had been investigated by the Maryland Board of Physicians, rather than CHC — █████ is an inappropriate comparator. See Radue, 219 F.3d at 617-18 (noting that proper comparator deals with same supervisor, is subject to same standards as plaintiff, and engages in similar conduct).

Of the physicians mentioned by Tshibaka, ████████ is the best argument for a true comparator. █████, a Caucasian physician, had allegedly sexually harassed ████████████ █████ while he was employed by Carroll Hospital Group ("CHG"), a subsidiary of CHC. ████████████████ ████████████████████████████████████ ████████████████████████████████ CHG and █████ made a letter of disciplinary action in January 2012, which contained provisions similar to those in Tshibaka's Early Resolution Agreement. To resolve the allegations, █████ agreed, by the letter, to cease and desist from all activities that could be construed as sexual harassment, undergo a mental health evaluation, attend treatment sessions, and abide by a last chance agreement similar to Tshibaka's.

22

After CHG and ███████ executed the letter of disciplinary action, a patient reported that ███████ had made her feel uncomfortable. When the patient was interviewed, however, she spoke highly of ██████ and failed to confirm the complaint. CHG therefore decided that the complaint was not credible and took no disciplinary action. CHG later declined to renew ███████ employment contract, but unlike Tshibaka, he yet has full hospital privileges at CHC.

A significant difference precludes us from deeming ███████ to be an appropriate comparator: ██████ was not treated more leniently than Tshibaka. Each entered into an agreement with a last chance provision, and each was subject to a psychological evaluation and counseling. Although a subsequent complaint alleged that ████████████████████████████████████, the complaint was unsubstantiated. CHG therefore concluded that ██████ had not contravened his last chance agreement. Elliott's complaint against Tshibaka, on the other hand, was substantiated through several layers of review. Tshibaka has thus failed to show that ██████ is an appropriate comparator because "differentiating circumstances" distinguish their conduct and their employers' treatment of them. See Radue, 219 F.3d at 618.

In these circumstances, there is no genuine dispute of material fact concerning the prima facie test. Because Tshibaka has failed to forecast sufficient evidence to make a prima facie

23

showing, we are satisfied to affirm the summary judgment award to the CHC defendants on the § 1981 claim.

2.

Next, Tshibaka contends that the district court erred in dismissing his § 1981 claim as to Elliott on the ground that she was a mere nonsupervisory co-worker who was not involved in the decision to terminate Tshibaka's hospital privileges. As we have recognized, there may be circumstances where § 1981 liability could be imposed on individuals. See, e.g., Tillman v. Wheaton-Haven Recreation Ass'n, 517 F.2d 1141 (4th Cir. 1975). We have not decided, however, whether a nonsupervisory co-worker can be liable under § 1981.

To revive his § 1981 claim against Elliott, Tshibaka relies on Smith v. Bray, where the Seventh Circuit concluded that a subordinate employee with an unlawful motive may be individually liable under § 1981 for intentionally causing the employer to take an adverse employment action against the subordinate's fellow employee. See 681 F.3d 888, 896-99 (7th Cir. 2012), overruled on other grounds by Ortiz v. Werner Enters., Inc., No. 15-2574, slip op. at 4 (7th Cir. Aug. 19, 2016). The Smith court explained that such individual liability flows from the "cat's paw" theory of employer liability, under which the employer can be liable "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe

24

in a deliberate scheme to trigger a discriminatory employment action." Id. at 897 n.3 (internal quotation marks omitted).

Tshibaka has alleged in his amended complaint that Elliott "intentionally sought to revoke [his] hospital privileges on the grounds of race," and that the CHC defendants' proffered reason for terminating his privileges was based on Elliott's false allegations of sexual harassment. See Am. Compl. ¶¶ 65-66. Arguably then, the operative complaint alleges under Smith a colorable theory of Elliott's § 1981 liability, as well as the "cat's paw" theory of the CHC defendants' liability.

We will not decide here whether to adopt the reasoning of Smith, however, because Tshibaka has foreclosed imposing § 1981 liability on Elliott by admitting — under oath — that he did not believe Elliott made her internal sexual harassment complaint on the basis of race. Specifically, Tshibaka was asked during discovery, "So you don't believe that [Elliott] herself was racially motivated in making her allegations; is that right?" See J.A. 726. Tshibaka responded, "That's correct." Id. Consistent with that testimony, Tshibaka failed to pursue the "cat's paw" theory against the CHC defendants, instead maintaining only that they had acted out of their own racial animus. In these circumstances, we are constrained to affirm the district court's judgment in favor of Elliott on the § 1981 claim. See MM v. Sch. Dist. of Greenville Cty., 303 F.3d

25

523, 536 (4th Cir. 2002) (recognizing our authority "to affirm [a] judgment on alternate grounds, if such grounds are apparent from the record"); see also Boston Prop. Exch. Transfer Co. v. Iantosca, 720 F.3d 1, 12 (1st Cir. 2013) (affirming the dismissal of claims that "would inevitably have failed at the summary judgment stage").

B.

1.

We turn to Tshibaka's state law contract and tort claims. The district court awarded summary judgment to the CHC defendants on the tort claims after determining that those defendants are entitled to HCQIA immunity. The court separately analyzed the merits of the breach of contract claim before awarding summary judgment to the CHC defendants on that claim as well. Because HCQIA immunity encompasses breach of contract claims, however, a separate analysis of the contract claim was unnecessary. That is, if the CHC defendants are entitled to HCQIA immunity on the tort claims, they also get such immunity on the contract claim. See, e.g., Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 610-14 (4th Cir. 2009) (affirming dismissal of contract and tort claims pursuant to HCQIA).[8]

_____

[8] Notably, HCQIA does not provide immunity to defendants in civil rights lawsuits, including those under 42 U.S.C. § 1981. See 42 U.S.C. § 11111(a)(1).

Congress enacted HCQIA in 1986, seeking to encourage good faith professional review activities, and thereby reduce medical malpractice and enhance the quality of medical care. See 42 U.S.C. § 11101. HCQIA immunizes the professional review actions of professional review bodies from civil damages. Id. § 11111(a). A "professional review action" is defined, in relevant part, as

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could adversely affect the health or welfare of a patient or patients) and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

Id. § 11151(9). "Professional review activities" are the activities of a health care entity seeking to determine "whether [an individual] physician may have clinical privileges with respect to, or membership in, the entity." Id. § 11151(10). A professional review body is a health care entity — along with the governing body or any committee of a health care entity — that conducts professional review activities. Id. § 11151(11).

To obtain HCQIA immunity, a health care entity's professional review action must fall within the breadth of the statute, in that the action was taken or made:

> (1)  in the reasonable belief that the action was in furtherance of quality health care,

27

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures [were] afforded to the physician involved or after such procedures as [were] fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of [sub]paragraph (3).

42 U.S.C. § 11112(a)(1)-(4). Notably, the requirements of subparagraph (a)(3) are couched in the disjunctive. That is, a health care entity can obtain HCQIA immunity by acting either "after adequate notice and hearing procedures [were] afforded to the physician" or, in the alternative, "after such procedures as [were] fair to the physician under the circumstances." Id. § 11112(a)(3). Moreover, we have recognized that HCQIA provides a safe harbor for professional review actions that is "but one way a health care entity can comply with the requirements of [subparagraph] (a)(3)." See Wahi, 562 F.3d at 607-08 (discussing safe harbor provisions of § 11112(b)). HCQIA does not preclude a hospital from suspending or restricting a physician's clinical privileges "subject to subsequent notice and hearing or other adequate procedures," if a failure to take such an action "may result in an immediate danger to the health of any individual." See 42 U.S.C. § 11112(c)(2).

Importantly, a professional review action presumptively qualifies for HCQIA immunity "unless the presumption is rebutted

28

by a preponderance of the evidence." See 42 U.S.C. § 11112(a). Immunity applies unless — viewing the totality of the circumstances in an objectively reasonable manner — the aggrieved physician rebuts the presumption that the professional review action satisfied HCQIA. See Wahi, 562 F.3d at 610. At the summary judgment stage, a court must assess

> whether a reasonable jury, viewing all facts in a light most favorable to [the physician], could conclude that he had shown, by a preponderance of the evidence, that [the professional review body's] actions fell outside the scope of [the requirements specified in § 11112(a)(1)-(4)].

Id. at 607 (quoting Gabaldoni v. Wash. Cty. Hosp. Ass'n, 250 F.3d 255, 260 (4th Cir. 2001)).

Here, the parties agree that the hearing panel and the Board both qualify as professional review bodies and that the termination of Tshibaka's hospital privileges was a professional review action. Tshibaka contends, however, that the CHC defendants failed to satisfy HCQIA in multiple ways:

(1) CEO Sernulka failed to properly investigate Elliott's sexual harassment complaint and determine whether Tshibaka constituted an immediate threat of danger before suspending him;

(2) Sernulka refused to listen to Tshibaka's side of the story;

(3) Sernulka improperly prohibited Tshibaka from appearing before the MEC to defend himself in the summary suspension proceeding;

(4) Sernulka deliberately withheld the report of clinical sexologists Thomas and Kraft, and

29

instead presented to the MEC only Elliott's statements and the Early Resolution Agreement;

(5) Medical Staff Attorney Bartel improperly presided over and bifurcated the merits hearing, and her actions prevented Tshibaka from presenting pertinent facts and argument concerning Sernulka's conduct;

(6) Bartel improperly introduced into evidence the last chance provision of the Early Resolution Agreement but excluded the clinical sexologists' report;

(7) The CHC defendants failed to give Tshibaka a fair hearing before the Board; and

(8) The Board erroneously decided that Elliott was credible as to both incidents, although it did not observe or hear her testimony.

Having carefully and fully assessed the record and the written submissions of the parties to this appeal, together with the argument of counsel, we discern no error in the district court's application of HCQIA immunity. We are therefore content to adopt the court's reasoning in that regard and affirm the judgment in favor of the CHC defendants on the state law contract and tort claims.

2.

Finally, Tshibaka alleged one additional state law claim — the defamation claim against Elliott — which the district court dismissed by ruling that Elliott is entitled to immunity under Maryland law. Specifically, the court concluded that Elliott is entitled to the absolute immunity that Maryland common law utilizes to protect witnesses in judicial or quasi-judicial

30

proceedings. See Gersh v. Ambrose, 434 A.2d 547, 550-52 (Md. 1981). Our assessment of that question leads us to be somewhat hesitant.

First, we are unable to identify any decision of a Maryland appellate court that has extended absolute immunity to a witness in a non-governmental administrative proceeding, such as a peer review process at a health care facility. Second, Maryland has enacted certain statutory provisions that grant a qualified or conditional privilege for those involved in the medical review process. See Md. Code, Health Occ. § 1-401(a)(3) and (4); Md. Code, Cts. & Jud. Proc. § 5-637(b). We can only speculate on whether Maryland intended for that statutory privilege to abrogate common law absolute immunity — which may or may not apply to Elliott — or whether the statutory privilege was meant to complement common law immunity.

Put succinctly, the district court did not evaluate the applicability of the statutory privilege to Tshibaka's defamation claim against Elliott. It is therefore appropriate for that court to first assess the statutory privilege and its potential interplay with common law immunity. We will thus

vacate the dismissal of Tshibaka's defamation claim and remand for further proceedings thereon.[9]

IV.

Pursuant to the foregoing, we affirm the judgment against Tshibaka on his 42 U.S.C. § 1981 claim, as well as on his contract and tort claims against the CHC defendants. We vacate the dismissal of the defamation claim against Elliott, however, and remand for such other and further proceedings as may be appropriate.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>

---

[9] Further proceedings in the district court might include certification to the Court of Appeals of Maryland, <u>see</u> Md. Code, Cts. & Jud. Proc. § 12-603, or remand to the state trial court, <u>see</u> 28 U.S.C. § 1367; <u>Hinson v. Norwest Fin. S.C., Inc.</u>, 239 F.3d 611, 616 (4th Cir. 2001).